No. 98,586

CATHY THOMAS, Administratrix of the ESTATE OF ANTHONY D. STAPLETON, *et al., Appellants*, v. THE COUNTY COMMISSIONERS OF SHAWNEE COUNTY, KANSAS, *et al. Appellees*.

(262 P.3d 336)

Opinion filed September 23, 2011.

*Robert R. Laing, Jr.*, of Kansas City, argued the cause and was on the briefs for appellants.

*William A. Larson*, of Larson & Blumreich, Chartered, of Topeka, argued the cause and was on the briefs for appellees.

*Teresa L. Watson*, of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, was on the brief for *amicus curiae* Kansas Association of Counties.

The opinion of the court was delivered by

BEIER, J.: This case arises on petition for review filed by Defendants David Tipton, Matthew Biltoft, and Shawnee County (County) from the Court of Appeals' partial reversal of summary judgment in their favor. Plaintiffs allege defendants' negligence led to the suicide of Anthony D. Stapleton while he was incarcerated in the Shawnee County Adult Detention Center. Defendants argue that they are entitled to summary judgment on duty and breach and that they are immune from suit under the Kansas Tort Claims Act (KTCA).

## FACTUAL AND PROCEDURAL BACKGROUND

Stapleton committed suicide on November 29, 2002, while housed in the Close Observation unit of the Detention Center. The unit was created for inmates who possessed one or more suicide risk factors.

Plaintiffs originally filed suit in federal court, alleging both federal constitutional violations and state law negligence claims. District Judge Julie A. Robinson granted defendants' motion for summary judgment on plaintiffs' federal constitutional claims and declined to exercise supplemental jurisdiction over plaintiffs' state law claims.

Plaintiffs then filed this suit in state court. They claimed that Tipton, the guard on duty, was negligent in guarding, supervising, and observing Stapleton before his suicide. Plaintiffs claimed that Biltoft, the assistant shift supervisor on duty, was negligent in guarding, supervising, and observing Stapleton before his suicide and that he was negligent in the supervision of jail employees. Plaintiffs also claimed that Director of the Shawnee County Department of Corrections, Betsy Gillespie, was negligent in training, monitoring, and supervising her employees, and that County Commissioners Ted Ensley, Marice Kane, and Victor Miller were negligent in hiring and retaining Gillespie as director. Finally, plaintiffs alleged that Shawnee County was vicariously liable for the negligence of the other defendants.

Defendants filed a motion for summary judgment, and Judge Larry D. Hendricks granted it. The judge concluded that defendants owed Stapleton a duty of reasonable care if they knew or should have known that Stapleton was a suicide risk, but he further determined that there was no genuine issue of material fact on whether defendants breached that duty of care. In the alternative, the judge ruled that, even if defendants breached their duty of care, defendants were immune from suit under the KTCA.

On appeal, a panel of our Court of Appeals reversed in part and affirmed in part. *Thomas v. Board of Shawnee County Comm'rs*, 40 Kan. App. 2d 946, 198 P.3d 182 (2008). It held that the district court erred in granting summary judgment to Tipton. It also re-

versed the summary judgment in favor of Biltoft on plaintiffs' negligence theory, but it affirmed the summary judgment on the negligent supervision claim against him. The panel affirmed the district court's summary judgment in favor of Gillespie, Ensley, Kane, and Miller. It reversed the district court on KTCA immunity.

Tipton, Biltoft, and the County are the only defendants who remain in the case as it arrives here. Plaintiffs did not petition for review of the Court of Appeals' holdings regarding the other defendants. They also did not petition for review on the negligent supervision claim against Biltoft. See *Tyler v. Employers Mut. Cas. Co.*, 274 Kan. 227, 244, 49 P.3d 511 (2002) (court lacks jurisdiction to consider argument for which cross-appeal not filed).

The record on appeal demonstrates that the following facts are undisputed, at least for purposes of summary judgment.

*Detention Center Operation and Suicide Prevention Policy*

Tipton was the guard on duty in the Close Observation unit where Stapleton was housed. Tipton had received initial training in suicide prevention and had undergone further training every 6 months. Biltoft, the assistant shift supervisor in charge of the Detention Center on the day of Stapleton's suicide, also had received initial and in-service training in suicide prevention.

During Gillespie's tenure as Director, which began in August 2000, before Stapleton's suicide, there had been three suicides at the center. Gillespie did not receive any formal job performance evaluations from the commissioners or anyone else, although she testified that she received informal evaluations. After each suicide occurred at the center, Gillespie spoke to the commissioners.

At the time of Stapleton's suicide, the Detention Center had in place policies and procedures regarding the health care of inmates, including a suicide prevention policy. The policy "[t]o prevent inmates from self-harm and death while in the custody of the Adult Detention Center" instructs staff "to be alert to indicators of potentially suicidal behaviors and make immediate, appropriate referral(s) to determine degree of risk for self-harm and/or suicide when the indicators occur. Appropriate action shall be taken to

protect the inmate." The policy's definitional section labeled "**Suicide Watch**" stated in pertinent part:

"Continuous supervision provided to an inmate who is considered to be at imminent risk for suicide. When the inmate is assigned to a cell that is protrusion-free, the officer assigned to suicide watch duties shall observe the inmate(s) frequently, at least every 4 minutes, and document the observations as they are completed."

The definitional section for "**Close Observation**" stated in pertinent part:

"Close monitoring and supervision of an inmate who is not imminently suicidal but who possesses one or more suicide risk factors . . . . Staff shall observe these inmates with greater frequency than general population, but at a minimum, shall conduct 15-minute health and well-being checks of inmates placed on this status."

The relevant segments of Section I of the "PROCEDURES" section of the policy on "**Observation of Suicide Risk Factors**" provided:

"B.  Staff who work directly with inmates shall consistently monitor inmates under their supervision for any of the following risk factors or behaviors:
. . . .
6.   weight loss or loss of appetite,
. . . .
13.  crying frequently,
. . . .
19.  expressing suicidal thoughts or plans,
20.  composing a suicide note,
21.  talking of death and/or afterlife,
. . . .
23.  highly agitated, afraid, or angry,
. . . .
"C.  Staff who observe any of the risk factors or behaviors noted . . . shall immediately report the behavior(s) verbally and in writing to the shift supervisor.

The relevant segments of Section II of the "PROCEDURES" section of the policy on "**Screening for Risk of Suicide**" provided:

"B.  Whenever a shift supervisor has been notified about potentially suicidal information and/or behaviors regarding a specific inmate, the shift supervisor shall assign a line supervisor to complete the Screening Form . . . as soon as possible.

1. Staff shall ensure that the inmate in question is monitored carefully until the screening is completed."

Section III of the policy dealt with "**Intervention to Prevent Suicide**," the majority of it devoted to how to evaluate and react to the Screening Form. But its Subsection D stated: "Immediately following an unsuccessful suicide threat or attempt, the inmate shall be placed on Suicide Watch."

Section IV of the policy, labeled "**Suicide Watch**," stated in its Subsection A that the purpose of Suicide Watch "shall be to prevent an inmate who is imminently suicidal from actually committing the act of suicide or otherwise harming himself or herself." Additional relevant subsections provided:

"B. Suicide Watch shall include:
 1. assignment to a single, protrusion-free cell . . . ;
 2. removal of all property;
 3. a mattress for sleeping;
 . . . .
 7. frequent/continuous supervision by staff.
. . . .
"I. The officer assigned to supervise the inmate on Suicide Watch in a protrusion-free cell shall monitor the inmate's behavior on a frequent basis, observing and recording the inmate's behavior at least every 4 minutes.
 1. Under no circumstances shall there be longer than 4 minutes between checks of each inmate under Suicide Watch."

Section V, Subsection A of the policy on "**Close Observation Status**" read: "The purpose of Close Observation Status shall be to more carefully monitor the behavior and actions of an inmate who is not imminently suicidal but who possesses one or more suicide risk factors." Its other relevant subsections read:

"B. Close Observation shall include:
 1. assignment to a double cell within a designated Close Observation unit, unless serious security concerns cause double-celling to be inappropriate for a specific inmate;
 . . . .
 4. frequent observation by staff with a minimum of 15-minute health and well-being checks;
 . . . .

7. frequent shakedowns of each cell, at least one time per shift on the first and second shifts."

. . . .

"D. If a Close Observation inmate becomes seriously insubordinate and/or violent, the inmate shall be secured in a protrusion-free cell for Suicide Watch."

The policy permits only mental health professionals—defined as persons who have "specialized training and skills in the nature and treatment of mental illness," including "licensed psychiatrists, social workers, psychologists, and psychiatric nurses"—to determine when an inmate should be removed from Suicide Watch or Close Observation.

The Close Observation classification system had been initiated by Gillespie, who testified in her deposition that mental health workers were brought in to the Detention Center to provide suicide prevention training to center personnel. Supervisors were given additional training in conducting suicide risk screenings beyond that required for all officers. Evidence before the district court also established that it was rare for someone other than an inmate with suicidal issues to be placed in Close Observation. At the time of Stapleton's suicide, inmates in Close Observation were supposed to be out of their cells as much as possible to socialize and improve their function.

According to Tipton's deposition testimony, Tipton was not told or informed of the reasons a specific inmate was assigned to Close Observation. The role of guards in Close Observation was to watch all of the inmates, to follow the policy of checking on each inmate visually every 15 minutes, and to conduct cell shakedowns once per shift. Guards on duty were responsible for reporting to their supervisors if there were changes in an inmate's behavior symptomatic of suicide, based on the training the guards had received. Pursuant to the suicide prevention policy, the supervisor was then to see that a suicide risk screening was conducted.

Also, according to Gillespie, although the policy was not written to cover the subject at the time, it was always communicated clearly that inmates in Close Observation were not allowed to cover their cell windows. Gillespie also said that she could not recall if it had been specifically stated in Detention Center policies at the time,

but it was certainly understood that a guard could not watch television during his or her shift.

Tipton testified in his deposition that, at the time of Stapleton's suicide, inmates would put cardboard over the windows of their cells when they used the toilet. Tipton testified that no one had reprimanded him for allowing inmates to do this.

Biltoft testified that, as assistant shift supervisor, it was his job to make sure everyone showed up to work, to make sure everyone was given the proper equipment, to make sure that all the duty posts were covered, to ensure guards were properly performing their jobs, to take formal head counts, to conduct searches of cells housing Suicide Watch inmates, to answer questions and resolve problems on the units, and to take care of any miscellaneous business. He also testified that supervisors like him were involved in evaluations of whether inmates should be placed on Suicide Watch. Other staff members, including social workers, also were involved.

*Stapleton's Mental Health Screenings and Placement*

At the time of his suicide on November 29, 2002, Stapleton had been in the detention center for 38 days pending trial on a charge of aggravated robbery. Stapleton received a total of seven suicide evaluations during the 38 days: one on October 23, 2002; two on October 24, 2002; one on October 28, 2002; one on November 7, 2002; one on November 23, 2002; and one on November 25, 2002, 4 days before he killed himself.

These evaluations resulted in Stapleton being placed in the Close Observation unit and then on Suicide Watch, from October 24 until October 28, when he was moved back to the Close Observation unit. Evaluations used to classify Stapleton before October 28 noted that he was crying and that he had attempted suicide 1 year before. Stapleton also told one evaluator that he felt he had no family, that no one cared about him, and that he wanted to die. By the time Stapleton was moved back to the Close Observation unit, social worker Leslie Huss determined that his mood had improved, that he was not crying, and that he was more upbeat. Huss also noted at that time that Stapleton denied any current suicidal ideation or plans.

*Stapleton's Suicide*

One or 2 days before Stapleton's suicide, a guard telephoned plaintiff Cathy Thomas, Stapleton's mother, to tell her that Stapleton wanted to tell her that he loved her. Thomas thought this was unusual, was concerned, and said so. Thomas also told the guard that her husband had committed suicide and that Stapleton had attempted suicide a month before his detention. The guard told Thomas not to worry because Stapleton was in a special unit and being watched. Thomas also testified in her deposition that, shortly before his suicide, Stapleton had not eaten for 3 days. Her son was permitted to call her as part of a "deal" with guards to ensure that he would start eating again.

No one told Tipton that Stapleton's mother had expressed concern about her son's safety or the possibility of him committing suicide, nor was Tipton informed that Stapleton had previously attempted suicide—either 1 month before, as Thomas said, or 1 year before, as was recorded in Stapleton's mental health evaluation documentation. Tipton testified that he generally was not informed of the specific reason a particular inmate was placed in the Close Observation unit.

Close Observation Progress Notes, completed on every inmate on the unit after each guard shift, show that Stapleton was crying 2 days before his suicide. The notes also indicate that Stapleton talked about getting high most of the day before his suicide.

On the morning of his suicide, Stapleton got into an argument with guard Curtis Jones over the size of Stapleton's jumpsuit.

Biltoft's Officer Report Sheet states that he received a call from Jones at 9:05 a.m. The Report Sheet further states that Biltoft and Jones "discussed the option of moving [Stapleton] to [S]uicide [W]atch status due to his disruptive behavior." Biltoft heard Stapleton saying something in a "demanding manner" while he was on the phone with Jones. When Jones hung up and Biltoft called back, Biltoft spoke with Tipton. Biltoft's Report Sheet states that Tipton "said that he thought [Stapleton] should go to special housing" and "mentioned that [Stapleton] had acted inappropriately" toward Jones.

Biltoft's Report Sheet also states that Biltoft went to talk to Stapleton. Stapleton "appeared to be angry" and told Biltoft that moving to special housing would just make him "crazy." Biltoft's Report Sheet also states that Stapleton accused Jones of "messing with him" regarding the jumpsuit. After discussing the situation, Stapleton "appeared to almost start crying" and said that he thought he "was always in the wrong." After talking to Stapleton, Biltoft left Stapleton in his cell and went to speak with Tipton. Biltoft told Tipton that he "believed [Stapleton] would be all right." Then, according to Biltoft's Report Sheet, Biltoft again spoke with Jones. Jones told Biltoft Stapleton "needed to be in special housing," because he was a disciplinary problem, not a suicide threat.

According to Biltoft, Duty Station Reports from the day of Stapleton's suicide do not note that Stapleton left the Close Observation unit common area and went to his room. However, the Officer's Report Sheet completed by Tipton states that Stapleton finished a shower and went to his cell at the 10 a.m. head count. Tipton testified in his deposition that the cells in the Close Observation unit were within the direct sight of guards in the guard station.

At 10:16 a.m., Stapleton's roommate said he could not get the door of their shared cell open. The window of the cell door had been covered. Tipton went to the cell and saw what appeared to be a sheet wedged in the door. Tipton found Stapleton hanging from the other side of the door, unwound the sheet from his neck, and placed him on the floor for medical attention.

At approximately 10:20 a.m., according to Biltoft's Report Sheet, Tipton radioed with a medical emergency. When Biltoft responded, he saw Stapleton lying on the floor of his cell with Tipton performing rescue breaths and another inmate performing chest compressions. Biltoft heard Tipton say something like: "I knew it, he should have [gone] to special."

Darrell Myrick, another inmate in the Close Observation unit on the day of Stapleton's suicide, said that, after Stapleton's disagreement with the guards, he heard Stapleton say he was going to kill himself two or three times. Myrick further testified that Stapleton made these statements loudly enough to be heard by the

guards, including Tipton, who was 15 feet away watching television. For his part, Tipton testified that the televisions in the unit were not visible from the guard station without a guard straining his or her neck.

Myrick also testified about other observations of Tipton's behavior on the morning Stapleton's suicide. Myrick said that Tipton was sick that day and mainly sat at the guard station, missing his 10 a.m. and 10:15 a.m. checks. The Duty Station Report maintained by Tipton does not show any missed 15-minute inmate checks on the morning of Stapleton's suicide up until 10 a.m. It contains no entries between 10 a.m. and 10:45 a.m. that day.

Myrick testified that Stapleton went into his cell before 10 a.m. and was found hanging at 10:20 a.m. When Myrick looked over at Stapleton's cell door, he said he could see a big ball with a knot 6 inches to 8 inches around hanging over the top of the door.

A jail chaplain, Father Joseph Chontos, gave deposition testimony about a conversation he had with Tipton on the day of Stapleton's suicide. Chontos testified that it was his understanding, based on this conversation, that Tipton believed Stapleton should have been moved to Suicide Watch because he was a threat to himself, not because he was a discipline problem. In an affidavit attached to defendants' summary judgment motion, Tipton said that he never believed Stapleton was a suicide risk and had not told Chontos otherwise.

Three suicide letters were found in Stapleton's cell after his suicide. One was dated November 3, 2002, another, November 23, 2002. The third was undated.

### The District Court's Assessment of the Facts

The district judge's memorandum decision and order granting summary judgment to defendants also includes as additional uncontroverted facts that Thomas told Stapleton's probation officer of Stapleton's suicide attempt the day after it occurred, which was 1 month before Stapleton's detention began; that Thomas received letters from Stapleton while Stapleton was in detention; and that Thomas spoke to Detention Center guards on several occasions.

The judge appears to have made additional factual findings in the discussion section of his memorandum decision and order. He stated that Tipton believed Stapleton should be placed on Suicide Watch because Stapleton was a disciplinary problem, not because he was a suicide risk. In the judge's view, the record did not support Tipton's awareness of Stapleton's November 29 statements that he was going to kill himself. The judge also wrote: "Stapleton was appropriately screened and allowed to calm down, and it was determined that . . . a move [to Suicide Watch] was not necessary." He said no evidence was presented to show that Stapleton's behavior should have led Biltoft to believe Stapleton was at substantial risk of committing suicide. The judge also did not think Biltoft had ignored Stapleton's crying or Tipton's or Jones' suggestions that Stapleton be placed on Suicide Watch.

*The Court of Appeals' Factual Recitation*

In addition to setting forth facts largely consistent with the district judge's list of uncontroverted facts, the Court of Appeals noted that Close Observation guards were trained to treat all inmates in the unit as if they possessed risk factors for suicide. The panel recognized that, although Tipton insisted he had recommended Stapleton's transfer to Suicide Watch only because he was a disciplinary problem, Chontos testified that Tipton reacted just after the suicide by saying that he had believed Stapleton was a threat to himself. The panel also noted that Biltoft determined Stapleton did not need to be transferred to Suicide Watch without arranging for a formal suicide screening. In addition, the panel observed, there was no record that a shakedown of Stapleton's cell in the Close Observation unit had ever been completed. 40 Kan. App. 2d at 949-50.

## ISSUES

Defendants' petition for review set out two issues. First, they challenged the Court of Appeals' decision that Tipton's and Biltoft's knowledge of Stapleton's housing in the Close Observation unit was sufficient "in and of itself" to create a genuine issue of material fact on whether they knew or should have known there

was a risk of Stapleton's suicide. This issue goes to whether any duty defendants owed to Stapleton was triggered or breached. Defendants' second challenge to the Court of Appeals' decision focused on the KTCA's discretionary function exception, which they believe applies to give them immunity from suit.

We perceive the need to address another legal issue first. Although defendants have expressly conceded that they owed a duty to Stapleton, they have not identified its source or described its nature. We believe that a full understanding of the duty is necessary to enable us to decide whether there is evidence that it was triggered or breached and whether KTCA immunity is available. We therefore begin our analysis by examining the duty Kansas jailers owe to the jailed.

## DISCUSSION

### Applicable Standards of Review

Our general standard of review for summary judgment is well known and often stated:

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules[,] and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citations omitted.]" *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 (2009).

It is also important to remember that " ' "summary judgment should not be used to prevent the necessary examination of conflicting testimony and credibility in the crucible of a trial." ' " *Esquivel v. Watters*, 286 Kan. 292, 296, 183 P.3d 847 (2008). In a negligence action, " ' "summary judgment is proper if the only questions presented are questions of law. To recover for negligence, the plaintiff must prove the existence of a duty, breach of

that duty, injury, and a causal connection between the duty breached and the injury suffered. Whether a duty exists is a question of law. Whether the duty has been breached is a question of fact." ' " *Sall v. T's, Inc.*, 281 Kan. 1355, 136 P.3d 471 (2006); see also *Adams v. Board of Sedgwick County Comm'rs*, 289 Kan. 577, 586, 214 P.3d 1173 (2009) (citing *Nero v. Kansas State University*, 253 Kan. 567, 571, 861 P.2d 768 [1993]) (existence of duty question of law). Although summary judgment is rarely appropriate in negligence cases, "it is proper if the plaintiff fails to provide evidence of an element essential to his case." *Hammig v. Ford*, 246 Kan. 70, 73, 785 P.2d 977 (1990); see also *Deal v. Bowman*, 286 Kan. 853, 858, 188 P.3d 941 (2008) (" 'Only when the facts are such that reasonable men must draw the same conclusion from them does the question of negligence become one of law for the court.' ").

On appeal, questions of law, including those at the heart of summary judgment decisions, are subject to de novo review. See *Soto v. City of Bonner Springs*, 291 Kan. 73, 78, 238 P.3d 278 (2010) (applicability of KTCA immunity); *Adams*, 289 Kan. at 586 (existence of duty).

*Sources and Nature of Duty Owed to Stapleton*

As mentioned, defendants concede the existence of a duty owed to Stapleton. Their memorandum in support of their summary judgment motion stated that they have found no Kansas caselaw on the question, but they nevertheless concluded there was consensus on jail authorities owing inmates a duty of reasonable care.

In response, plaintiffs directed the district court to K.S.A. 19-1919 and *Bukaty v. Berglund*, 179 Kan. 259, 267, 294 P.2d 228 (1956). In their view, these Kansas authorities supported the existence of a duty to treat inmates with humanity and to provide medical attention.

The district judge concluded that defendants owed Stapleton a duty of reasonable care. He relied upon the "general rule" from Annot., 79 A.L.R.3d 1210 § 2(a), which states:

: "In accordance with the general rule that a duty of reasonable care is owed by prison or jail authorities to a prisoner to keep him safe from unnecessary harm, the courts which have considered the question under annotation have generally

recognized that if such authorities know or have reason to believe that the prisoner, unless forestalled, might do harm to himself or to others, reasonable care must be used by those authorities to assure that such harm does not occur."

The district judge did not mention or interpret K.S.A. 19-1919.

When this case reached our Court of Appeals, the panel cited Restatement (Second) of Torts § 314A(4) (1964) to support the existence of a custodian's legal duty to take reasonable steps to prevent those in custody from harming themselves. *Thomas*, 40 Kan. App. 2d at 954-55. The panel also evaluated numerous Kansas cases in which a custodial relationship was determined to be a special relationship imposing a duty of care. *Thomas*, 40 Kan. App. 2d at 951-54 (citing *Jackson v. City of Kansas City*, 263 Kan. 143, 947 P.2d 31 [1997]; *C.J.W. v. State*, 253 Kan. 1, 853 P.2d 4 [1993]; *Washington v. State*, 17 Kan. App. 2d 518, 839 P.2d 555, *rev. denied* 252 Kan. 1095 [1992]; *Cansler v. State*, 234 Kan. 554, 675 P.2d 57 [1984]). And the panel cited two federal cases predicting that Kansas would apply this duty of care to prison suicide cases. *Thomas*, 40 Kan. App. 2d at 955 (citing *Estate of Sisk v. Manzanares*, 262 F. Supp. 2d 1162, 1185-87 [D. Kan. 2002]; *Griffin v. United States*, 2000 WL 33200259 [D. Kan. 2000] [unpublished opinion]). The Court of Appeals placed no reliance on K.S.A. 19-1919.

This court has looked to K.S.A. 19-1919 in earlier cases to identify a source of the duty owed by custodians to persons in their custody. The statute provides in relevant part: "All prisoners shall be treated with humanity, and in a manner which promotes their reform."

In *Wesley Med. Center v. City of Wichita*, we said that "[i]t has long been the statutory law of Kansas that it is the duty of all keepers of jails and prisons to treat their prisoners with humanity. K.S.A. 19-1919, which specifically so provides, was enacted as a part of the General Statutes of 1868 in Chapter 53, Section 19." 237 Kan. 807, 809, 703 P.2d 818 (1985). Forty-five years earlier, in *Pfannenstiel v. Doerfler*, a negligence action against a county jail for failure to provide medical care to a prisoner, this court held that the plaintiff established a cause of action because "[i]t is the duty of a sheriff or other officer having lawful custody of a prisoner

to treat the prisoner properly, and, as the statute (G.S. 1935, 19-1919) says, 'with humanity.' " 152 Kan. 479, 483, 105 P.2d 886 (1940). K.S.A. 19-1919 and these cases "place a positive duty upon [custodians] to furnish medical attention to a prisoner in custody who is in need of medical attention." *Wesley Med. Center*, 237 Kan. at 810.

Although we have not previously drawn an explicit, direct connection between the K.S.A. 19-1919 duty to treat a prisoner with humanity, including the provision of needed medical attention, and the potential for custodian liability for a prisoner suicide, this connection has been established in Kansas federal court. "Claims arising from a jail suicide 'are considered and treated as claims based on the failure of jail officials to provide medical care for those in their custody.' " See, *e.g.*, *Estate of Sisk*, 262 F. Supp. 2d at 1175 (quoting *Barrie v. Grand County*, 119 F.3d 862, 866 [10th Cir. 1997]).

Further, a "majority of courts [in other jurisdictions] hold that the sheriff or other officer owes a duty to the prisoner to keep him safely and to protect him from unnecessary harm, and it has also been held that the officer must exercise reasonable and ordinary care for the life and health of the prisoner." Annot., 14 A.L.R.2d 353 § 2[a] (citing series of cases including: *Smith v. Miller*, 241 Iowa 625, 628, 40 N.W.2d 597 [1950] [sheriff owes general duty to prisoners to save from harm; sheriff liable for negligence causing injury, death]; *City of Topeka v. Boutwell*, 53 Kan. 20, 20, 35 P. 819 [1894] [duty of keepers of jail to treat prisoners humanely]; *O'Dell v. Goodsell*, 149 Neb. 261, 265, 30 N.W.2d 906 [1948] [sheriff bound to exercise control, management of jail to degree of care necessary for reasonably adequate protection of prisoners]; *City of Belen v. Harrell*, 93 N.M. 601, 603, 603 P.2d 711[1979] [jail custodian has duty to exercise reasonable, ordinary care for protection of life, health of person in custody]).

With these authorities as our foundation, we now hold that K.S.A. 19-1919 is one source of defendants' duty to Stapleton and others like him in their custody.

Another potential source of the duty at the heart of this case, as our Court of Appeals recognized, is Restatement (Second) of Torts

§ 314A(4). It identifies certain special relationships that give rise to an affirmative duty to aid or protect, saying the following:

"One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other."

Comment d to this subsection explains that "[t]he duty to protect the other against unreasonable risk of harm extends to risks arising out of the actor's own conduct" and that "[t]he duty to give aid to one who is ill or injured extends to cases where the illness or injury is due to . . . the negligence of the plaintiff himself." Comment e further explains that the duty owed "is only . . . to exercise reasonable care under the circumstances" and that "[t]he defendant is not liable where he neither knows nor should know of the unreasonable risk, or of the illness or injury."

We have previously acknowledged the duty of a custodian to protect a person in custody under this Restatement provision.

In *C.J.W. v. State*, this court relied upon § 314A(4) as the source of the defendant custodian's duty when the plaintiff alleged that a fellow inmate sexually assaulted him while both were confined at a juvenile facility. *C.J.W.*, 253 Kan. at 8. We said:

"There are several sections of the Restatement (Second) of Torts which appear applicable to the case before us. Restatement (Second) of Torts § 314A (1964) sets forth certain special relations which may give rise to a duty on the part of one person to protect another. It provides, in part, that one who is required by law to take custody of another under circumstances which deprive that person of the normal opportunities for protection is under a duty to protect the person taken into custody against unreasonable risk of physical harm from others." *C.J.W.*, 253 Kan. at 8.

Until the decision of the Court of Appeals panel in this case, however, Kansas courts have not considered whether § 314A(4) is implicated when a prisoner harms himself or herself rather than suffering injury at the hands of a third party.

The Kansas federal district court has predicted the outcome on this question: "Kansas courts would . . . impose a legal duty on a custodian to take reasonable steps to prevent the individual from injuring himself." *Estate of Sisk*, 262 F. Supp. 2d at 1186. The *Sisk* case arose from the suicide of Scotty Ray Sisk while he was incar-

cerated in the Detention Center in Shawnee County. District Magistrate Judge James P. O'Hara determined that Restatement (Second) of Torts § 314A established the duty owed to Sisk.

The conclusion in *Sisk* rested on a previous unpublished decision, *Griffin v. United States*, in which federal (now Chief) District Judge Kathryn H. Vratil noted:

"It appears that Kansas courts have not decided whether persons who exercise custody over others have a duty to protect them from injuring themselves. The Kansas Supreme Court has recognized that a custodial relationship is a special relationship which gives rise to a duty of care to third persons. See, *e.g.*, *Cansler v. State of Kansas*, 234 Kan. 554, 560-65, 675 P.2d 57, 63-66 (1984) (state had duty to exercise reasonable care to prevent inmates from harming others); *P.W. v. Kansas [Dept. of SRS]*, 255 Kan. 827, 832, 877 P.2d 430, 434 (1994) (special relationships include persons with custody of another). In so ruling, the Kansas Supreme Court has cited the rules set forth in Restatement (Second) of Torts §§ 314A, 316-320 (1965). See *Cansler*, 234 Kan. 554 at 564, 675 P.2d at 66; *P.W.*, 255 Kan. at 832, 877 P.2d at 434." *Griffin v. United States*, 2000 WL 33200259, at *5 (D. Kan. 2000).

Our *P.W. v. Kansas Dept. of SRS* case, 255 Kan. 827, 877 P.2d 430 (1994), cited by Judge Vratil, involved an allegation of negligence against Kansas Department of Health and Environment (KDHE) and the Kansas Department of Social and Rehabilitation Services (SRS) for failing to revoke or suspend the license of a day care center, or to take other corrective actions, where plaintiffs alleged violations and abuses by the owner-operators of the center. In it, we identified Section 314A, although not its particular subsection (4), as the provision establishing a special relationship between custodians and persons in their custody. *P.W.*, 255 Kan. at 832. We ultimately concluded, however, that the duty we identified under the Restatement was not implicated, because KDHE and SRS, the plaintiffs, and the third party did not fit into the special relationships set out in Restatement (Second) of Torts §§ 314A, pp. 316-19 and 320. See *P.W.*, 255 Kan. at 833.

We believe this case is the right one in which to extend our § 314A(4) analysis, and we therefore hold that it constitutes an alternate source of the duty owed by defendants to Stapleton. Defendants had a duty to protect Stapleton against unreasonable risk of harm, including risk arising out of his own conduct.

This duty did not make defendants guarantors of Stapleton's safety. But it imposed upon them the obligation to exercise reasonable care under the circumstances, a duty triggered if they knew or should have known of an unreasonable risk to Stapleton's safety. See Restatement (Second) of Torts § 314A, comments d and e; see also Annot., 79 A.L.R.3d 1210 § 2[a] ("courts which have considered the question . . . have generally recognized that if [jail or prison] authorities know or have reason to believe that the prisoner, unless forestalled, might do harm to himself or to others, reasonable care must be used by those authorities to assure that such harm does not occur"). We now turn to the evidence in the record on whether the actual or constructive knowledge necessary to support a trigger of defendants' duty existed here.

*Tipton's and Biltoft's Actual or Constructive Knowledge*

In order for defendants' duty to be triggered, they must have known or had reason to know that Stapleton was likely to do harm to himself. See Restatement (Second) of Torts § 314A, comment e; 79 A.L.R.3d 1210 § 2[a]; *Thomas*, 40 Kan. App. 2d at 956-57.

The district judge concluded in this case that Tipton and Biltoft had "no prior knowledge of Stapleton's suicidal tendencies" and that Tipton's desire to transfer Stapleton from the Close Observation unit to Suicide Watch "was not the result of some belief that Stapleton posed a risk of suicide, but rather the result of Stapleton being deemed a disciplinary problem."

In contrast, the Court of Appeals relied heavily, if not exclusively, on Stapleton's housing in the Close Observation unit—the purpose of which, in the words of the Detention Center Suicide Prevention policy, is "to more carefully monitor the behavior and actions of an inmate who is not imminently suicidal but who possesses one or more suicide risk factors"—to determine that the defendants' duty to protect Stapleton from himself was triggered. Defendants' challenge the Court of Appeals' reliance on the Close Observation unit housing "in and of itself." 40 Kan. App. 2d at 959.

Our analysis departs from that of both the district judge and the Court of Appeals.

After careful review of the entire record available at the time of summary judgment, we conclude that the district judge erred in deciding these factual issues on conflicting evidence. This was not his role on summary judgment. See *Nelson v. Nelson*, 288 Kan. 570, 578, 205 P.3d 715 (2009) (when considering summary judgment motion, district judge must consider evidence in light most favorable to nonmoving party). On the other end of the spectrum, we conclude that the Court of Appeals need not have put such heavy weight on the wording of a single passage in the Suicide Prevention policy and Stapleton's housing in the Close Observation unit. Plaintiffs came forward with plenty of evidence to survive a motion for summary judgment on this issue. Several genuine issues of material fact exist on whether Tipton and Biltoft had enough actual or constructive knowledge of Stapleton's risk of self-harm to mean that they had a duty to take reasonable steps beyond those they took to prevent his suicide.

Among the plaintiffs' evidence is the testimony of Chontos, the jail chaplain who spoke with Tipton shortly after Stapleton's suicide. Chontos' conversation with Tipton led Chontos to understand that Tipton believed Stapleton should have been moved to Suicide Watch because he was a danger to himself.

This testimony is stronger than, but generally supported by, Biltoft's admissions that Tipton told him when Stapleton's argument with Jones was reported that Tipton thought Stapleton should be moved from the Close Observation unit to "special housing," and that Biltoft heard Tipton say shortly after Stapleton was found hanging that Tipton "knew" Stapleton "should have [gone] to special."

The testimony of inmate Myrick also cannot be ignored, which, inexplicably, seems to have been the district judge's approach. Myrick testified that, shortly before the suicide, Stapleton repeatedly announced his intention to kill himself within earshot of Tipton, who was, contrary to policy, watching television and missing 15-minute checks.

As the Court of Appeals observed, Stapleton's continued housing on the Close Observation unit rather than in general population after repeated screenings also should have contributed to plaintiffs'

defense of summary judgment on this issue. The Suicide Prevention policy states that Close Observation is designed for inmates with one or more suicide risk factors. Both Tipton and Biltoft had received suicide prevention training and certainly were aware of this fact, even if we assume the truth of Tipton's statement that he was not generally informed about any inmate's particular mental health situation when the inmate arrived on the unit.

There is also evidence in the record of Stapleton's possession of, and staff's awareness of his possession of, several risk factors listed in the Suicide Prevention policy during the days and hours leading up to his suicide. Among other things, he had not eaten regularly for several days in the period leading up to November 29. He had been crying and, according to Biltoft, appeared to "almost start crying" after his dispute with Jones over the jumpsuit. His mother had voiced concerns to Detention Center personnel. And, again, according to Myrick, Stapleton expressed his suicidal intentions repeatedly, within Tipton's hearing, had Tipton been paying attention rather than watching television.

On this record, defendants were not entitled to summary judgment on the actual and constructive knowledge trigger for their duty to Stapleton.

*Breach of Duty*

Plaintiffs' original petition alleged that Tipton was negligent in supervising Stapleton and by failing to observe him because he was allowed to be in his cell with his window obstructed. It alleged that Biltoft was negligent by failing to place Stapleton on Suicide Watch.

By the time plaintiffs responded to defendants' motion for summary judgment, they made additional and more specific allegations about Tipton's negligence, including:

"(a) failing to properly guard or supervise Anthony Stapleton; (b) watching television instead of properly guarding or supervising Anthony Stapleton; (c) failing to notice that Anthony Stapleton had pried a sheet through his door when it was in plain view of Officer Tipton; (d) allowing Anthony Stapleton to return to his cell unsupervised for an inordinate amount of time; (e) allowing Anthony Stapleton to cover the window to his cell; (f) in not taking extra precaution with Anthony Stapleton when officer David Tipton had in fact earlier in the day made a rec-

ommendation or request that Anthony Stapleton be moved to suicide watch[;] (g) in not observing or checking on Anthony Stapleton for an inordinate amount of time[;] and (h) not following rules relating to shakedown of Anthony Stapleton's cell."

On Biltoft's alleged negligence, plaintiffs' summary judgment response also was more expansive:

"(a) not properly supervising Officer Tipton; (b) ignoring Officer David Tipton's suggestion that Anthony Stapleton be placed on suicide watch; (c) ignoring Officer Curtis Jones' suggestion that Anthony Stapleton be placed on suicide watch; (d) failing to provide any follow up observation or supervision of Anthony Stapleton after he learned of the suicide concerns relative to Anthony Stapleton[;] (e) failing to conduct a suicide screening after having been notified of the suicide risk by Defendant Tipton[;] and (f) failing to observe that required cell shakedowns had not occurred."

When the district judge made his summary judgment ruling, he stated that the facts of this case failed to "conclusively show" defendants

"acted in a negligent manner with regard to Stapleton. Given that Stapleton was on Close Observation status at the time of his suicide, all that was required of Tipton and Biltoft was adherence to the Jail's written policy for Close Observation status. Since they sufficiently followed these guidelines, they did not breach the duty of reasonable care owed to Stapleton."

As to Tipton in particular, the district judge said there was no support, "except speculation," for plaintiffs' assertion that Tipton's actions on Stapleton's supervision were unreasonable.

As to Biltoft, the district judge concluded that, "even if Stapleton's behavior and his mother's calls were sufficient grounds for Biltoft to be aware of a substantial risk of suicide, Biltoft's response to that threat was reasonable." The judge noted the Suicide Prevention policy's dictate that a seriously insubordinate inmate "shall be secured in a protrusion-free cell for Suicide Watch," but he concluded that "Stapleton was appropriately screened and allowed to calm down, and it was determined that such a move was not necessary." In the judge's view, Biltoft's decision to visit with Stapleton after the dispute with Jones over the jumpsuit rather than to arrange for a suicide screening was "not unreasonable."

The Court of Appeals panel did not discuss the issue of breach. We nevertheless address it. Both parties have argued the issue, and we can envision a scenario on remand when the issue of whether defendants are entitled to judgment as a matter of law on breach could arise again.

The breach element of a negligence case is rarely amenable to a sound decision on summary judgment. See *Deal*, 286 Kan. at 859-60; *Sall*, 281 Kan. at 1375. The reasonableness of a defendant's conduct is inherently a factual question best left to the trier of fact. See *Deal*, 286 Kan. at 860.

Here, the district judge departed from this conventional wisdom, but this is the usual, rather than the unusual, case. Plaintiffs were able to marshal sufficient evidence to prevent summary judgment in favor of defendants on the issue of breach. Although the district judge recited that he was viewing that evidence in the light most favorable to plaintiffs, the nonmoving parties, it appears he did not actually do so. In addition, he focused on one passage in the Detention Center's Suicide Prevention policy to the exclusion of other, equally relevant segments.

When the available evidence on the reasonableness of Tipton's and Biltoft's conduct is examined in the light most favorable to plaintiffs and the Myrick testimony is, as it must be, given credence rather than ignored or dismissed as mere "speculation," there are genuine issues of material fact remaining over the degree of attention Tipton was paying Stapleton on the morning of Stapleton's suicide. There are fact questions, for example, on whether Tipton heard or should have heard Stapleton express an intention to kill himself, on whether Tipton saw or should have seen a knotted sheet appear over Stapleton's cell door.

Myrick's and Gillespie's testimony, as well as that of Tipton himself, posed other obstacles to summary judgment for the defense. There is a fact question on whether Tipton was abiding by policies and procedures on the frequency of inmate checks, on television viewing by guards, and on coverings on inmates' cell door windows.

In addition, Chontos' testimony appears to have been inappropriately disregarded by the district judge. When the evidence from Chontos is viewed generously, again, as it must be, it does not

qualify as speculation. Rather, Chontos reported his understanding of what Tipton contemporaneously expressed, long before this case gave Tipton any incentive to revise history, about the reason Tipton advocated sending Stapleton to Suicide Watch. Tipton's current version of his motivation is in direct conflict. This sets up a classic genuine issue of material fact for trial.

Multiple sections of the Suicide Prevention policy also are significant. The district judge was correct that Stapleton was housed in the Close Observation unit, but evidence supports plaintiffs' argument that even its standards were not being met. The discovery of three suicide notes with varying dates in Stapleton's cell after his suicide, for example, indicates that required cell shakedowns by staff were nonexistent or less than adequate.

There is also a hotly contested question on whether Stapleton still should have been housed in the Close Observation unit at the time of his suicide. The evidence on this point is conflicting. Was it reasonable, after Stapleton's dispute with Jones and the report from Jones and Tipton to Biltoft, and after Biltoft's followup conversation with Stapleton, for Biltoft to leave Stapleton on Close Observation rather than ensuring he be moved to Suicide Watch or, at the least, receive another suicide screening? Despite the district judge's ruling to the contrary, there is more than one possible answer to this question under the Suicide Prevention policy.

Even if we assume that Jones and Tipton were motivated to report Stapleton to Biltoft because Stapleton's conduct may have qualified as "seriously insubordinate" rather than evidence of suicide risk, as defendants insist, Section V.D. of the Suicide Prevention policy states that a Close Observation inmate whose behavior is "seriously insubordinate . . . *shall* be secured in a protrusion-free cell for Suicide Watch."

If we assume, on the other hand, as some evidence supports, that Tipton was motivated to recommend moving Stapleton because he regarded Stapleton's agitation and anger as suicide risk factors and that he reported Stapleton to Biltoft under Section I.C. of the policy, or that Biltoft saw Stapleton appear to "almost start crying," implicating another risk factor under the policy, then Section II.B. of the policy required Biltoft to assign a line supervisor

to complete a specific suicide screening form as soon as possible. The policy does not give a shift supervisor such as Biltoft the option of merely talking to the inmate instead. Further, it requires careful monitoring of the inmate while the screening is pending. There is no evidence that the intensity of monitoring of Stapleton increased. In fact, as discussed above, there is evidence that it was more lax than permitted under the policy's Close Observation standard.

Our final criticism of the district judge's summary judgment ruling on breach is that it applied too demanding a standard to plaintiffs' proof. Plaintiffs were not required to "conclusively show" defendants' negligence to survive the defense motion. They were merely required to come forward with some evidence to support the existence of a genuine issue of material fact that would prevent judgment for defendants as a matter of law. See *U.S.D. No. 232 v. CWD Investments*, 288 Kan. 536, 556, 205 P.3d 1245 (2009) (party opposing summary judgment has duty to come forward with facts supporting its claim but need not prove its case). They met this relatively low bar, and the district judge's decision to the contrary was error.

*KTCA Immunity*

Although we have determined that plaintiffs should have survived defendants' summary judgment motion on the questions of the existence of a duty, trigger of the duty, and breach, defendants argue that they were nevertheless entitled to summary judgment because they were immune from liability under the KTCA. See *Adams v. Board of Sedgwick County Comm'rs*, 289 Kan. 577, 585, 214 P.3d 1173 (2009).

This lawsuit is subject to the KTCA because the defendants are employees of a governmental body and the governmental body itself. K.S.A. 2010 Supp. 75-6102(c) (defining "governmental entity" to include municipalities); K.S.A. 2010 Supp. 75-6102(b) (defining "municipality" to include counties); K.S.A. 2010 Supp. 75-6102(d) (defining "employee" to include "persons acting on behalf or in service of a governmental entity in any official capacity").

The KTCA provides:

"Subject to the limitations of this act, each governmental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state." K.S.A. 2010 Supp. 75-6103(a).

Under the KTCA, liability is the rule and immunity from liability is the exception. See, *e.g.*, *Soto*, 291 Kan. at 78 (citing *Kansas State Bank & Tr. Co. v. Specialized Transportation Services, Inc.*, 249 Kan. 348, 364, 819 P.2d 587 [1991]). The KTCA's analytical matrix requires us to ask, first, whether a private person could be liable under the circumstances. See *Adams*, 289 Kan. at 585. There is no dispute here that a private person can be liable for negligence. Given that, we then are required to examine whether a statutory exception to liability applies. See *Adams*, 289 Kan. at 585. Defendants bear the burden of demonstrating entitlement to immunity under an exception. *Soto*, 291 Kan. at 78.

In this case, defendants originally claimed they were immune under two different KTCA exceptions, the personnel policy exception of K.S.A. 2010 Supp. 75-6104(d) and the discretionary function exception of K.S.A. 2010 Supp. 75-6104(e). They have now abandoned their argument for application of the personnel policy exception. See, *e.g.*, *State v. Gomez*, 290 Kan. 858, 866, 235 P.3d 1203 (argument not raised or supported by pertinent authority abandoned). We therefore turn to their claim of immunity under the discretionary function exception.

This statutory exception provides:

"A governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from:
. . . .
(e) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion is abused and regardless of the level of discretion involved." K.S.A. 2010 Supp. 75-6104(e).

The statute does not define "discretionary function or duty." *Soto*, 291 Kan. at 79.

The district judge's analysis of the applicability of this exception was abbreviated and less than clear. He cited *Barrett v. U.S.D. No.*

259, 272 Kan. 250, 263, 32 P.3d 1156 (2001), and noted that "[a] governmental agency cannot claim that its actions are protected by the [discretionary function] exception where those actions violate a legal duty." He then ruled that Gillespie's adoption of the Suicide Prevention policy fulfilled any duty to protect the health and safety of inmates, and "any questions arising from the implementation of her policy can be classified as discretionary, and thus protected under K.S.A. 75-6104(e)." This passage in the district judge's memorandum decision appears to have conflated the concepts of breach and statutory immunity.

The Court of Appeals' discussion of the discretionary function exception also was remarkably limited. It too cited *Barrett*, 272 Kan. at 263. It did so for the proposition that the discretionary function exception did not apply because defendants owed a duty of care to Stapleton under Restatement (Second) of Torts § 314A, and this duty was independent of any written policy. *Thomas*, 40 Kan. App. 2d at 965-66 (also citing *Nero v. Kansas State University*, 253 Kan. 567, 585, 861 P.2d 768 [1993]; *Cansler*, 234 Kan. at 570). We acknowledge some ambiguity in the language of certain earlier cases on this point, see *Nero*, 253 Kan. at 585; *Cansler*, 234 Kan. at 570; *Estate of Sisk*, 262 F. Supp. 2d at 1186, but the existence of an "independent" legal duty is an explicit consideration for the KTCA personnel policy exception, not its discretionary duty exception. Compare K.S.A. 2010 Supp. 75-6104(d) and (e).

In order to determine whether a function or duty is discretionary for purposes of the KTCA, "Kansas courts look foremost to the nature and quality of the discretion exercised." *Soto*, 291 Kan. at 79 (citing *Bolyard v. Kansas Dept. of SRS*, 259 Kan. 447, 452, 912 P.2d 729 [1996]; *Robertson v. City of Topeka*, 231 Kan. 358, 361-62, 644 P.2d 458 [1996]). Further, "[t]he mere application of any judgment is not the hallmark of the exception." *Soto*, 291 Kan. at 79 (citing *Allen v. Kansas Dept. of SRS*, 240 Kan. 620, 623, 731 P.2d 314 [1987]). But "[t]he more a judgment involves the making of policy[,] the more it is of a 'nature and quality' to be recognized as inappropriate for judicial review." *Kansas State Bank & Tr. Co.*, 249 Kan. at 365. The necessity that the actor employ expertise, whether educational or experiential, also is relevant to determining

whether an action is discretionary or ministerial. See *Allen*, 240 Kan. at 623 (employee's action not discretionary when decision on how to clean vomit from floor did "not invol[ve] any particular skill or training"). Negligent performance of a ministerial act is not within the protective orbit of the discretionary function exception. See *Nero*, 253 Kan. at 587 (quoting *Dougan v. Rossville Drainage Dist.*, 243 Kan. 315, 315, 757 P.3d 272 [1988]).

As Professor William E. Westerbeke has observed, several principles guide application of the discretionary function exception by Kansas courts: (1) "[T]he discretionary function primarily involves policy-oriented decisions and decisions of such a nature that the legislature intended them to be beyond judicial review," (2) "the immunity does not depend upon the status of the individual exercising discretion and thus may apply to discretionary decisions made at the operational level as well as at the planning level," and (3) "the discretionary function does not encompass conduct that is deemed 'ministerial,' *i.e.*, conduct that involves no discretion." Westerbeke, *The Immunity Provisions in the Kansas Tort Claims Act: The First Twenty-Five Years*, 52 Kan. L. Rev. 939, 960 (2004).

This court also has repeatedly put emphasis on the mandatory versus permissive character of direction given to the defendant actor. "[W]here there is a 'clearly defined *mandatory* duty or guideline, the discretionary function exception is not applicable.' " (Emphasis added.) *Soto*, 291 Kan. at 80 (quoting *Nero*, 253 Kan. at 585; and citing *Barrett v. U.S.D. No. 259*, 272 Kan. at 263; *Kansas State Bank & Tr. Co.*, 249 Kan. at 365). For purposes of the exception, "[a] *mandatory* guideline can arise from agency directives, case law, or statutes." (Emphasis added.) *Soto*, 291 Kan. at 80 (citing *Barrett*, 272 Kan. at 263; *Bolyard*, 259 Kan. at 452-54). Such a guideline leaves little to no room for individual decision making, exercise of judgment, or use of skill, and qualifies a defendant's actions as ministerial rather than discretionary. See *Nero*, 253 Kan. at 593-94 (citing *Dougan*, 243 Kan. at 322-23) (ministerial act "performance of some duty involving no discretion" where discretion defined as "capacity to distinguish between what is right and wrong, lawful and unlawful, or wise or foolish sufficiently to render one amenable and responsible for his acts").

Finally, we recognize that it is sometimes difficult, as defendants and *amicus* Kansas Association of Counties have pointed out in this case, to differentiate the duty that must exist as a component of a negligence action from the mandatory duty or guideline that eliminates the possibility of immunity under the KTCA's discretionary function exception. As this court described this difficulty in 1998:

"Although governmental entities do not have discretion to violate a legal duty, we have not held that the existence of any duty deprives the State of immunity under the discretionary function exception. If such were the case, K.S.A. 75-6104(e) could never apply in a negligence action, for in order to recover for negligence, a plaintiff must establish the existence of a duty." *Schmidt v. HTG, Inc.*, 265 Kan. 372, 392, 961 P.2d 677, *cert. denied* 525 U.S. 964 (1998) (citing *Jarboe v. Board of Sedgwick County Comm'rs*, 262 Kan. 615, 631, 938 P.2d 1293 [1997]).

See *Soto*, 291 Kan. at 80; *Barrett*, 272 Kan. at 264. Regardless of the difficulty, this differentiation must be made to avoid nullification of the KTCA's discretionary function exception in all negligence cases. See *McAlister v. City of Fairway*, 289 Kan. 391, 402, 212 P.3d 184 (2009) ("A statute should not be interpreted in such a manner as to make it meaningless."). The simplest way of ring-fencing the differentiation is to say that the function or duty at issue under K.S.A. 2010 Supp. 75-6104(e), when compared to a general legal duty of care, is likely to demand more specific acts or forbearance by potential defendants and likely to affect a narrower band of potential plaintiffs. To illustrate, the existence of a general legal duty of care may be acknowledged by both sides, as it is here, but the parties remain free to argue whether defendant jailers were permitted to exercise discretion in exactly how to discharge that general duty to an inmate such as Stapleton. Plaintiffs argue that Detention Center rules, and the Suicide Prevention policy in particular, imposed mandatory limits upon or forbade entirely the exercise of defendants' discretion in discharging their duty of care. Defendants, on the other hand, believe they still had room to maneuver in how they handled Stapleton's evaluation and protection. This is a dispute about the applicability of the KTCA discretionary function exception, not about the existence of a general legal duty of care.

How do we settle that dispute here?

First, we note that Tipton and Biltoft had different positions at the Detention Center. Tipton was a guard and Biltoft, a shift supervisor. Neither plaintiffs nor defendants have acknowledged this difference, perhaps heeding Westerbeke's admonition that discretionary function "immunity does not depend upon the status" of the actor. 52 Kan. L. Rev. at 960. For our part, we recognize that the Suicide Prevention policy assigned different roles to Tipton and Biltoft in certain respects, but neither was designated a policymaker. Rather, each was to function under the mandatory language of the policy at an operational level, albeit one at a level higher than the other's.

On Tipton, we conclude easily that the discretionary function exception does not apply. Under the Suicide Prevention policy and according to Gillespie's testimony, Tipton had no discretion to choose or reject several of the methods to be employed to protect Stapleton and others like him from themselves. Tipton had no autonomy to choose not to do 15-minute checks, to choose not to conduct cell shakedowns, or to allow inmates to cover their cell door windows. See, *e.g.*, *Soto*, 291 Kan. at 80 (recognizing that a clearly defined guideline can render the discretionary function exception inapplicable). He was not trusted to exercise his judgment on whether he should "consistently monitor" Stapleton for suicide risk factors rather than watch television. *Cf. Allen*, 240 Kan. at 622-23 (completion of task requiring no particular skill ministerial not discretionary). He had no option, if he saw risk factors surface—and certainly not if he heard an inmate express a suicidal intention or saw an inmate knot a sheet over his cell door—to choose not to report the same to Biltoft. See *Kansas State Bank & Tr. Co.*, 249 Kan. at 366-68 (failure to follow established school bus incident reporting policy nondiscretionary). The nature and quality of any latitude granted to Tipton in dealing with Stapleton was strictly, and mandatorily, circumscribed. There is no hint that the legislature intended to shield his negligence from judicial review.

On the disputed evidence now before us, we reach the same conclusion as to Biltoft. Again, there is nothing to indicate that he was acting in the role of a policymaker rather than a policy exec-

utor. Although Section V.D. of the Suicide Prevention policy may have granted him, as shift supervisor, the discretion to determine whether any insubordination by Stapleton was "serious" enough to warrant transfer to a protrusion-free cell for Suicide Watch, there is conflicting evidence on whether insubordination was the only or even one of the reasons that Jones and Tipton brought Stapleton's behavior to Biltoft's attention. If one or both of them, instead, reported Stapleton's behavior to Biltoft because they were required to do so under Section I.C. of the policy—"[s]taff who observe any of the risk factors . . . shall immediately report the behavior(s) verbally and in writing to the shift supervisor"—then Biltoft had no discretion under Section II.B. of the policy to do anything other than assign a line supervisor to complete a screening form on Stapleton as soon as possible. Biltoft, and other staff, for that matter would also have been required under Section II.B.1 to see that Stapleton was "monitored carefully" while the screening was being completed. All of this also would have been true if Biltoft recognized for himself that Stapleton's "almost crying" was a suicide factor under Section I.B. Biltoft could not simply have conversed with Stapleton and determined on his own that there was no suicide danger. The Suicide Prevention policy did not grant him that power. At this juncture in this case, on the evidence assembled so far, the KTCA discretionary function exception did not apply to provide immunity to Biltoft.

## CONCLUSION

In view of all of the above, defendants David Tipton and Matthew Biltoft were not entitled to summary judgment in their favor, and thus Shawnee County, alleged to be vicariously liable for their negligence, also was not entitled to summary judgment. Tipton and Biltoft owed a duty of reasonable care to Anthony D. Stapleton under both K.S.A. 19-1919 and Restatement (Second) of Torts 314A(4). Plaintiffs came forward with evidence to support their allegations that defendants' duty was triggered by Tipton's and Biltoft's actual or constructive knowledge of the risk that Stapleton would kill himself and to support breach of that duty. The discretionary function exception under the Kansas Tort Claims Act,

K.S.A. 2010 Supp. 75-6104(e), is not applicable to immunize defendants from liability for negligence in this lawsuit.

The judgment of the Court of Appeals is therefore affirmed. The judgment of the district court is reversed, and this case is remanded to the district court for further proceedings.

ROBERT J. SCHMISSEUR, District Judge, assigned.