IN THE SUPREME COURT OF THE STATE OF KANSAS

Nos. 117,518
117,519

SHELBY MONTGOMERY and SCOTT E. BENNETT,
*Appellants/Cross-appellees*,

v.

PATRICK R. SALEH and STATE OF KANSAS,
*Appellees/Cross-appellants*.

SYLLABUS BY THE COURT

1.

The public duty doctrine expresses a general rule that law enforcement duties are owed to the public at large and not to any specific person. Absent some special relationship with or specific duty owed an individual, liability will not lie for damages.

2.

K.S.A. 8-1506(d) imposes a duty on law enforcement officers in pursuit to "drive with due regard for the safety of all persons." Because the plain language of K.S.A 8-1506(d) imposes a specific duty, law enforcement may be held liable for breach of this duty.

3.

A law enforcement officer's pursuit of a fleeing suspect may be the proximate cause of a collision between the suspect and a third party as long as the evidence would support a reasonable inference that the law enforcement officer's conduct was the cause in fact of the collision.

1

4.

The Kansas Tort Claims Act (KTCA) provides that "each governmental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment." K.S.A. 75-6103(a). While the KTCA provides that governmental entities may be held liable for the negligence of their employees, K.S.A. 75-6104 sets out an extensive list of exceptions, explicitly stating that liability will not lie for certain conduct.

5.

A law enforcement officer's pursuit of a fleeing suspect does not fall within the discretionary function exception under K.S.A. 75-6104(e).

6.

A law enforcement officer's pursuit of a fleeing suspect does not fall within the "method of providing police . . . protection" exception found under K.S.A. 75-6104(n).

Review of the judgment of the Court of Appeals in 55 Kan. App. 2d 429, 419 P.3d 8 (2018). Appeal from Shawnee District Court; FRANKLIN R. THEIS, judge. Opinion filed June 26, 2020. Judgment of the Court of Appeals affirming in part and reversing in part the district court is affirmed. Judgment of the district court is affirmed in part and reversed in part, and the case is remanded to the district court with directions.

*Richard L. Budden*, of Shamberg, Johnson & Bergman, Chtd. of Kansas City, Missouri, argued the cause, and *Lynn R. Johnson*, of the same firm, was with him on the briefs for appellants/cross-appellees.

*Dwight R. Carswell,* assistant solicitor general, argued the cause, and *Jeffrey A. Chanay*, chief deputy attorney general, *Toby Crouse*, solicitor general, *Bryan C. Clark*, assistant solicitor general, *Rachael D. Longhofer*, assistant attorney general, and *Derek Schmidt*, attorney general, were with him on the briefs for appellees/cross-appellants.

PER CURIAM: This is a civil negligence suit brought by Shelby Montgomery and Scott Bennett. Montgomery and Bennett both sustained injuries when a Toyota driven by Robert Horton ran a red light and collided with Bennett's truck. At the time, Horton was being pursued by Kansas Highway Patrol Trooper Patrick Saleh. Montgomery and Bennett sued Trooper Saleh, claiming he was negligent in failing to cease his pursuit of Horton prior to when he did. They also sued the State of Kansas under a theory of vicarious liability. The district court eventually granted summary judgment for Saleh and the State. The Court of Appeals affirmed in part, reversed in part, and remanded for trial. We granted Saleh and the State's petition for review.

FACTS AND PROCEDURAL BACKGROUND

On the night of August 23, 2010, Kansas Highway Patrol Sergeant Tim Tillman was stopped at a red light at the intersection of Topeka Boulevard and 32nd Terrace. A red Toyota was stopped beside him in the northbound lane. Sgt. Tillman saw the Toyota's passenger holding a knife and speaking to the driver, though he could not hear what the passenger was saying. When the light turned green and the Toyota started to drive away, Tillman saw the Toyota's passenger swing the knife toward the driver. Tillman reported the Toyota's license plate number to dispatch, and dispatch informed him the license plate belonged to a different car.

Because Tillman was in plain clothes and driving an unmarked vehicle, he requested back-up. Saleh and Trooper Terry Fields, who were in the area, responded to the request. Because Saleh's car had a spotlight, Fields recommended that Saleh take over the stop. At this time, Saleh knew only that the Toyota's license plate was registered to a different car and that the passenger reportedly had a knife and was "swinging out the knife pretty strangely."

3

Trooper Saleh was traveling south on Topeka Boulevard and drove past the Toyota. He made a U-turn directly behind the Toyota and activated his red lights, siren, and dashboard video camera. The driver of the Toyota (later identified as Horton) then turned right onto 20th Street, heading east and rapidly accelerated. Horton ran a stop sign as he turned right onto Kansas Avenue and proceeded south.

Horton continued to accelerate, running a red light at the intersection of 21st Street and Kansas Avenue. Saleh stayed in pursuit, though he fell further behind the Toyota. Saleh accelerated to 80 to 90 miles per hour, and he estimated the Toyota's speed was over 100 miles per hour. Saleh decided to end the pursuit "[s]omewhere around the Wonder Bread outlet store," which was located just beyond 27th Street when traveling south on Kansas Avenue.

Before Saleh deactivated his emergency equipment, the Toyota ran through a red light at the intersection of Kansas Avenue and 29th Street. It collided with a pickup truck occupied by Bennett and Montgomery, who both suffered injuries in the crash. At the time of the collision, Saleh was about two-and-a-half blocks behind the Toyota. The entire pursuit had lasted about a minute and a half.

The Toyota's driver was later confirmed to be Horton. The passenger was a minor female who had been reported as a runaway. No knife was found in the Toyota or at the accident scene.

Bennett and Montgomery later filed separate petitions alleging negligence on the part of Trooper Saleh and the State of Kansas. Saleh and the State moved for summary judgment, arguing in part that (1) Bennett and Montgomery had failed to make a prima facie case of negligence; (2) Saleh did not owe a duty to Bennett and Montgomery under the public duty doctrine; and (3) the State had absolute immunity and Saleh had qualified immunity under the Kansas Tort Claims Act (KTCA), K.S.A. 75-6101 et seq.

4

The district court granted the motion. The court rejected the defendants' claims that the public duty doctrine applied or that the defendants had immunity under the KTCA. It also held a factual dispute existed as to whether Saleh had breached his duty of care. But it found that the plaintiffs' proffered evidence was insufficient to support a favorable jury verdict on causation in fact. As a result, the court entered summary judgment in favor of the defendants.

Bennett and Montgomery appealed. Saleh and the State cross-appealed. On Montgomery's motion, the Court of Appeals consolidated Bennett's and Montgomery's appeals. A majority of the Court of Appeals' panel affirmed the district court's findings on the public duty doctrine, immunity under the KTCA, and proof of breach of duty, but reversed the district court's finding on proof of causation and remanded for further proceedings. *Montgomery v. Saleh*, 55 Kan. App. 2d 429, 419 P.3d 8 (2018). A dissenting judge would have affirmed on the issue of proof of causation and declined to reach the issues on cross-appeal. 55 Kan. App. 2d at 452. We granted the defendants' petition for review with respect to all the issues Saleh and the State presented.

We, briefly, note the Court of Appeals also held that the claims asserted by the plaintiffs directly against the State for negligently failing to enforce appropriate pursuit policies or for negligence in hiring, retaining, supervising, or training Saleh were unsupported by any evidence and were abandoned on appeal. 55 Kan. App. 2d at 452. The plaintiffs did not independently seek review of the judgment against these claims. Those claims are, therefore, no longer at issue. See, e.g., *State v. Brosseit*, 308 Kan. 743, 746-47, 423 P.3d 1036 (2018) (failure to petition or cross-petition for review precludes review).

5

ANALYSIS

On review, the defendants argue the district court properly entered summary judgment in their favor and the Court of Appeals erred in reversing the district court. The rules relating to summary judgment are well established:

> """Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and when we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied."' [Citation omitted.]" *Patterson v. Cowley County, Kansas*, 307 Kan. 616, 621, 413 P.3d 432 (2018).

Here, the plaintiffs alleged negligence on the part of the defendants. To succeed on a negligence claim, the plaintiff must establish the existence of a duty, a breach of that duty, an injury, and proximate cause. *Hale v. Brown*, 287 Kan. 320, 322-23, 197 P.3d 438 (2008). While summary judgment is rarely appropriate in negligence cases, it is proper if a plaintiff fails to establish a prima facie case demonstrating the existence of these four elements. *Thomas v. Board of Shawnee County Comm'rs,* 293 Kan. 208, 221, 262 P.3d 336 (2011). A plaintiff establishes a prima facie case by presenting "'evidence which, if left unexplained or uncontradicted, would be sufficient to carry the case to the jury and sustain a verdict in favor of the plaintiff on the issue it supports.'" *Robbins v. City of Wichita*, 285 Kan. 455, 470, 172 P.3d 1187 (2007).

*Duty*

As part of their negligence claim, the plaintiffs had to establish that Saleh owed them a duty of care. And, because they are suing a governmental entity and its employee, the plaintiffs here must establish that Saleh owed a duty to them individually rather than a duty owed to the public at large. *Williams v. C-U-Out Bail Bonds,* 310 Kan. 775, 778, 450 P.3d 330 (2019). Whether a duty exists is a question of law over which we have unlimited review. *Robbins*, 285 Kan. at 460.

The defendants argue that the public duty doctrine prevents the plaintiffs from establishing the existence of a duty owed to them.

> "The public duty doctrine expresses a general rule that law enforcement duties are owed to the public at large and not to any specific person. Absent some special relationship with or specific duty owed an individual, liability will not lie for damages. Under the public duty doctrine, an officer is immune from claims arising out of the performance or nonperformance of the officer's general duties. Liability arises only when an officer breaches a specific affirmative duty owed to a particular person. [Citations omitted.]" *Conner v. Janes,* 267 Kan. 427, 429, 981 P.2d 1169 (1999).

The defendants further argue that law enforcement pursuits fall within the purview of the public duty doctrine thus exempting them from any liability for the plaintiffs' injuries.

Although the public duty doctrine has several exceptions, the plaintiffs do not argue that those exceptions are present here. See *Williams*, 310 Kan. at 788-92. Instead, they rely on K.S.A. 8-1506, governing the operation of authorized emergency vehicles, to establish a specific duty. K.S.A. 8-1506 grants drivers of authorized emergency vehicles certain privileges that excuse them from following traffic laws under specified conditions. Along with these privileges, subsection (d) provides: "The foregoing

7

provisions shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of reckless disregard for the safety of others."

The Court of Appeals agreed with the plaintiffs, finding the language of K.S.A. 8-1506 created a specific duty owed to them. The panel also held this interpretation was consistent with *Robbins*, in which we addressed the standard of care under K.S.A. 8-1506. The defendants argue the panel's decision was erroneous because the plain language of K.S.A. 8-1506 creates a general duty to the public, not a specific duty to individuals. The defendants add *Robbins* did not address the applicability of the public duty doctrine to law enforcement pursuits.

Resolution of this issue requires interpretation of K.S.A. 8-1506. Statutory interpretation is a question of law subject to unlimited review. *Nauheim v. City of Topeka*, 309 Kan. 145, 149, 432 P.3d 647 (2019). The most fundamental rule of statutory construction is that the Legislature's intent governs if that intent can be ascertained. *State ex rel. Schmidt v. City of Wichita*, 303 Kan. 650, 659, 367 P.3d 282 (2016). We must, first, try to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. *Nauheim*, 309 Kan. at 149. When a statute is plain and unambiguous, we should not speculate about the legislative intent behind that clear language, and we should refrain from reading something into the statute that is not readily found in its words. *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016).

The plain language of K.S.A. 8-1506 imposes a duty on emergency vehicle drivers to "drive with due regard for the safety of all persons." As the Court of Appeals pointed out, this is a specific duty owed to "all persons" unlike other general duties—such as the duty to preserve the peace—which law enforcement owes to the public at large. The statute adds that its provisions do not "protect the driver from the consequences of reckless disregard for the safety of others." This language shows the Legislature did not

8

intend for K.S.A. 8-1506 to exempt drivers of emergency vehicles from the consequences of reckless conduct. Finally, interpreting K.S.A. 8-1506 the way the defendants suggest would mean the statute identifies a duty only to allow law enforcement to breach that duty with impunity. This would render the statute meaningless, and we presume the Legislature does not intend to enact meaningless legislation. *In re Marriage of Traster*, 301 Kan. 88, 98, 339 P.3d 778 (2014).

We also note this interpretation of K.S.A. 8-1506 is consistent with our prior caselaw. In *Robbins*, we considered K.S.A. 8-1506 in the context of negligence claims brought by individual plaintiffs, and we recognized the statute imposes a duty on law enforcement in pursuit of a fleeing vehicle to drive with due regard for the safety of all persons. 285 Kan. at 460-65. While prior caselaw had limited this duty to the operation of the vehicle during a pursuit, *Robbins* expanded this duty to include the decisions to initiate and continue a pursuit. 285 Kan. at 465-66. *Robbins* also held that in a negligence claim brought under this statute, the plaintiffs must establish law enforcement drove with reckless disregard for the safety of others in order to demonstrate a breach of that duty. 285 Kan. at 469. While *Robbins* did not address the public duty doctrine, it implicitly held K.S.A. 8-1506 imposes a specific duty on law enforcement, and individuals may bring suit for breach of this duty.

*Breach*

Next, we consider whether a genuine issue of material fact exists as to whether Saleh breached the duty imposed by K.S.A. 8-1506. While the existence of a duty is a question of law, whether that duty has been breached is generally a question of fact. *Deal v. Bowman*, 286 Kan. 853, 858, 188 P.3d 941 (2008).

The standard of care, under K.S.A. 8-1506, for law enforcement in pursuit is higher than mere negligence. Instead, a plaintiff must show law enforcement drove with

9

reckless disregard for the safety of others to establish a breach of duty. Reckless disregard in this context means "driving a vehicle under circumstances that show a realization of the imminence of danger to another person or the property of another where there is a conscious and unjustifiable disregard of that danger." *Robbins*, 285 Kan. 455, Syl. ¶ 6. This standard applies to the officer's decision to initiate the pursuit of a fleeing suspect, the officer's decision to continue that pursuit, and the officer's manner of operating his or her vehicle during the pursuit. 285 Kan. at 465-66.

To support their claim of breach of duty, the plaintiffs rely on Saleh's dashboard camera recording of the pursuit. They also presented Saleh's deposition in which he stated he believed the pursuit was unlikely to be successful after the Toyota ran the red light at 21st Street. Saleh also stated he did not decide to discontinue the pursuit until sometime after passing 27th Street.

The plaintiffs also presented evidence of the Kansas Highway Patrol's policy regarding when to initiate and reevaluate a pursuit. That policy, known as OPS-16, states:

> "Officers are expected to make a diligent and reasonable effort to stop all suspected or actual violators. The decision to initiate pursuit must be based on the pursuing officer's conclusion that the immediate danger to the officer and the public created by the pursuit is less than the immediate or potential danger to the public should the suspect remain at large."

OPS-16 identifies the following factors to take into consideration when deciding to initiate a pursuit:

> "a. nature and seriousness of violation;
>
> "b. road, weather and environmental conditions;

10

"c. population density and presence of vehicular/pedestrian traffic;

"d. officer's familiarity with area;

"e. patrol vehicle condition;

"f. alternative methods of apprehension;

"g. likelihood of successful apprehension;

"h. mutual aid agreements with city and county authorities."

OPS-16 also provides: "The primary pursuing unit shall continually re-evaluate and assess the pursuit situation including all of the initiating factors and terminate the pursuit whenever he or she reasonably believes the risks associated with continued pursuit are greater than the public safety benefit of making an immediate apprehension."

Finally, the plaintiffs presented an affidavit from their expert, criminologist Geoffrey Alpert, Ph.D. Dr. Alpert stated that Trooper Saleh's pursuit became futile once Horton ran the "stop sign on 21st" because "it was more likely than not that drivers of fleeing vehicles will continue to flee as long as they are being chased." He opined that Saleh should have ended the pursuit "between 20th and 21st street and no later than when [Horton] ran the red light at 21st street in an attempt to elude police."

Looking at this evidence, we conclude a material issue of fact exists as to whether Saleh exhibited reckless disregard in his decision to continue the pursuit of Horton. Before the pursuit began, Saleh was not aware of any conduct from which he could reasonably conclude Horton posed an immediate danger to the public which outweighed the danger created by a pursuit. Saleh tried to stop Horton for driving an automobile with an improper tag. No one reported that Horton had been driving recklessly before the attempted stop. Nor was there any suspicion that Horton might be intoxicated. And while Trooper Saleh was aware of reports that the passenger had a knife, nothing indicated

11

Horton was dangerous or posed an immediate threat to others or was otherwise incapable of safely operating his vehicle.

Once Saleh initiated the pursuit, Horton accelerated rapidly, running the stop sign on 20th Street. He then ran the red light at 21st Street while two other vehicles were poised to enter the intersection. Saleh admitted he did not believe his attempt to stop Horton was going to be successful after this point. Nevertheless, he continued to pursue Horton, estimating that Horton reached speeds in excess of 100 mph. As seen on the video recording, Horton was also crossing the yellow line and weaving in and out of traffic.

This evidence could support a reasonable conclusion that Trooper Saleh breached his duty of care under K.S.A. 8-1506. A jury could conclude that the Toyota's improper tag did not indicate the driver posed a danger to others which outweighed the danger of a high-speed pursuit. Still, Saleh initiated a pursuit, and he continued that pursuit after observing Horton's reckless driving. Saleh even continued the pursuit once he realized it was unlikely to be successful. Drawing all inferences in favor of the plaintiffs, we believe a jury could reasonably conclude Saleh realized his pursuit of the Toyota posed an imminent danger and he consciously and unjustifiably disregarded that danger.

The defendants argue this conclusion conflicts with *Robbins*, we disagree. In *Robbins*, the police department received a 911 call that Jeffrey Drechsler had been drinking and was causing a domestic disturbance. While police were on their way to the residence, Drechsler broke through a door with an ax, chased his wife, then pinned her to the bed while holding the ax over his head. After letting his wife go, he went out to the garage and broke the windows of her car.

An officer arrived at the home just as Drechsler got into his truck and left. The officer initiated a pursuit with his lights and siren on. The officer continued the pursuit

12

even after Drechsler ran a red light and temporarily drove on the wrong side of the road. Drechsler eventually broadsided a car driven by Amy Robbins, resulting in her death. Robbins' husband filed a wrongful death action against the city, chief of police, and the officers involved in the pursuit, claiming negligence in the pursuit of Drechsler. The district court granted the defendants' motion for summary judgment.

On review, we affirmed the district court's decision to grant summary judgment. We held the evidence was insufficient to support a prima facie finding that the officers had breached their duty of care under K.S.A. 8-1506—that is, "that the officers had a conscious and unjustifiable disregard of the danger the pursuit caused for other motorists." *Robbins*, 285 Kan. at 470. We concluded the pursuit was clearly justified given that "the officers were confronted with a drunken, violent, ax-wielding, fleeing offender whose very presence put whomever he encountered at serious risk of bodily injury." 285 Kan. at 470.

As the Court of Appeals noted, Trooper Saleh was not dealing with "similarly dire circumstances" as the officers in *Robbins* when he began his pursuit of the Toyota. *Montgomery*, 55 Kan. App. 2d at 442. Given this disparity, we cannot reach the same conclusion as we did in *Robbins*. We agree with the district court and the Court of Appeals that the proffered evidence presents a question of material fact as to whether Trooper Saleh breached his duty of care.

*Causation*

Next, we address whether the plaintiffs have established a prima facie case that Saleh's conduct was the proximate cause of their injuries. Whether a causal connection exists between a breached duty and the plaintiffs' injuries is a question of fact. *Yount v. Deibert*, 282 Kan. 619, 624, 147 P.3d 1065 (2006).

13

We have defined proximate cause as a cause that "in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act." *Puckett v. Mt. Carmel Regional Medical Center*, 290 Kan. 406, 420, 228 P.3d 1048 (2010). Proximate cause has two components: causation in fact and legal causation. Causation in fact means a cause-and-effect relationship exists between a party's conduct and the resulting harm. Legal causation means a party's conduct might foreseeably create a risk of harm and cause or contribute to the resulting harm. *Drouhard-Nordhus v. Rosenquist*, 301 Kan. 618, 623, 345 P.3d 281 (2015).

The defendants cite *Carl v. City of Overland Park, Kan.*, 65 F.3d 866 (10th Cir. 1995), in arguing the plaintiffs have failed to show Saleh's conduct was the proximate cause of their injuries. In *Carl*, the Tenth Circuit had to predict whether Kansas courts might allow a finding of proximate cause when a fleeing driver was injured or killed in the course of a police pursuit. It reviewed several Kansas cases and concluded that Kansas courts would find no proximate cause, noting that, in Kansas, "'the officer is not liable to the third party because the sole proximate cause is the fleeing party's negligence rather than the officer's conduct in electing to pursue.'" 65 F.3d at 873 (quoting *Hammig v. Ford*, 246 Kan. 70, 76, 785 P.2d 977 [1990]). The Tenth Circuit declined to speculate whether this court might allow liability in the event of a showing of egregious misconduct, such as deliberately initiating a pursuit through a parade, a school crossing zone, or a densely populated area during rush hour. 65 F.3d at 874.

Relying on *Carl*, the defendants argue that the sole legal cause of the plaintiffs' injuries was Horton's conduct. But the Court of Appeals declined to follow *Carl*, concluding it was an outlier from the modern trend of putting the issue of proximate cause in police pursuit cases to the jury. *Montgomery*, 55 Kan. App. 2d at 445; see also *Carl*, 65 F.3d at 875 (Bright, J., concurring) (noting the "modern trend of police chase cases leaves the proximate cause issue to the jury"). On review, the defendants challenge

14

the panel's conclusion. They argue the panel failed to explain why *Carl* was inconsistent with Kansas precedent.

We note that the Tenth Circuit decided *Carl* before our decision in *Robbins*. *Robbins* did not reach the issue of causation because it held the plaintiffs had failed to present evidence of a breach of duty. But the conclusion that police conduct can, in some circumstances, be the proximate cause of an accident involving a third party is consistent with *Robbins*. If law enforcement conduct can never be the proximate cause of an accident, then the issue of breach of duty would be irrelevant.

Moreover, the extent to which the panel's decision conflicts with *Carl* is of little consequence. *Carl* represents the Tenth Circuit's prediction on how this court would rule on this issue. It is not binding on Kansas courts.

While we did not reach the issue of causation in *Robbins*, we moved to the brink of holding that law enforcement's conduct can be the proximate cause of injuries to a third party. We also note a majority of jurisdictions have concluded that causation in police pursuit cases is a question of fact for the jury. See *Montgomery*, 55 Kan. App. 2d at 446-47 (listing cases). We now join this majority and hold law enforcement's conduct during a pursuit can be the legal cause of a third party's injuries.

Having determined Saleh's conduct could legally be the cause of the plaintiffs' injuries, we turn to whether the plaintiffs have proffered evidence from which a reasonable jury could conclude his conduct did cause their injuries. We have described the burden of proof on causation as follows:

> "'The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter

15

remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant. Where the conclusion is not one within common knowledge, expert testimony may provide a sufficient basis for it, but in the absence of such testimony it may not be drawn. . . .

"'The plaintiff is not, however, required to prove the case beyond a reasonable doubt. The plaintiff need not [negate] entirely the possibility that the defendant's conduct was not a cause, and it is enough to introduce evidence from which reasonable persons may conclude that it is more probable that the event was caused by the defendant than that it was not. The fact of causation is incapable of mathematical proof, since no one can say with absolute certainty what would have occurred if the defendant had acted otherwise. Proof of what we call the relation of cause and effect, that of necessary antecedent and inevitable consequence, can be nothing more than 'the projection of our habit of expecting certain consequents to follow certain antecedents merely because we had observed these sequences on previous occasions.' If as a matter of ordinary experience a particular act or omission might be expected, under the circumstances, to produce a particular result, and that result in fact has followed, the conclusion may be permissible that the causal relation exists.'" *Yount v. Deibert*, 282 Kan. 619, 628-29, 147 P.3d 1065 (2006) (quoting Prosser & Keeton on Torts § 41, 269 [5th ed. 1984]).

The plaintiffs rely on three pieces of evidence to show causation: Trooper Saleh's dashboard video camera recording of the pursuit; Dr. Alpert's affidavit; and the deposition testimony of a Kansas Highway Patrol officer explaining the purpose behind certain pursuit procedures.

Saleh's video shows Horton began to engage in reckless driving once the pursuit began. Horton was driving at a high rate of speed and disobeying traffic signals during the pursuit. The video indicates about 46 seconds pass from the time the plaintiffs argue Trooper Saleh should have ended the pursuit and the time of the crash. During much of this time, the Toyota is visible to Trooper Saleh.

16

As previously noted, Alpert stated in his affidavit that Saleh's pursuit became futile once Horton ran the "stop sign on 21st" because "it was more likely than not that drivers of fleeing vehicles will continue to flee as long as they are being chased." Alpert went on to conclude that if "the police [had] terminated their active attempt to apprehend [Horton], it is more likely than not that he would not have crashed into the pick-up driven by [plaintiff Bennett] at 29th."

In a deposition, Kansas Highway Patrol Lieutenant Scott Martin agreed officers generally follow a specific procedure when ending a pursuit, including notifying dispatch of the termination, slowing down to the speed limit, and turning off emergency equipment. He also agreed that "one of the reasons for terminating a pursuit is the hope that the vehicle being pursued will then slow down and not create a hazard to vehicular and pedestrian traffic."

We believe this evidence establishes a dispute as to whether Saleh's conduct was a cause in fact of the plaintiffs' injuries. Here, Horton had not been driving recklessly before Saleh initiated the pursuit. Instead, the pursuit incited Horton to rapidly accelerate and to ignore traffic signals. As the Court of Appeals concluded,

> "Had the pursuit ended before the scene of the crash, Horton would have had no incentive
> to continue at such a break-neck speed and in such a reckless manner, risking his own life
> in the process. Whether, in fact, he would have is not for us to say. Our task is to view the
> evidence in the light favoring the plaintiffs to determine if one could reasonably infer that
> once the chase ended Horton would have changed his behavior accordingly."
> *Montgomery*, 55 Kan. App. 2d at 448-49.

The defendants argue the plaintiffs' theory of causation is purely speculative. They point out the plaintiffs provided no direct evidence of what Horton saw as he sped down Kansas Avenue toward 29th Street. They question whether Horton could have even seen

17

if Saleh had terminated his pursuit, noting Saleh had fallen two-and-a-half blocks behind Horton by the time of the crash, and Kansas Avenue leading up to 29th Street is curved and passes over a hill. They also assert Alpert's opinion is based on mere speculation, and he provided no reason to support his conclusion that more likely than not the crash would not have happened if Saleh had ended his pursuit no later than 21st Street.

We find the defendants' arguments unpersuasive. While the defendants are correct that the plaintiffs did not present direct evidence of what Horton saw during the pursuit or what he was thinking, lack of direct evidence is not fatal to the plaintiffs' attempt to present a prima facie case. A plaintiff may use circumstantial evidence to prove causation. That evidence need not exclude every other reasonable conclusion as long as it forms a basis from which a jury could draw a reasonable inference. *Yount*, 282 Kan. 619, Syl. ¶ 1.

At this point in the proceedings, we must view the evidence in the light most favorable to the plaintiffs. Looking at the evidence in this light, a jury could reasonably conclude that Horton was aware of Saleh's pursuit. Experience would also allow the jury to draw the conclusion that Horton "engaged in such reckless conduct primarily because he was being chased by police, and that this misconduct would have ceased had the police discontinued the pursuit. There is nothing extraordinary in this conclusion." *Montgomery*, 55 Kan. App. 2d at 449 (quoting *City of Pinellas Park v. Brown*, 604 So. 2d 1222, 1228 [Fla. 1992]).

Finally, the defendants argue Dr. Alpert provided no reasons supporting his conclusion that the collision more likely than not would have been avoided if Trooper Saleh had ended his pursuit sooner. But this goes to the weight of Dr. Alpert's testimony. It is the jury's role to consider and determine the weight of a witness' testimony. And even without Dr. Alpert's testimony, a jury could still rely on the video recording of the

18

pursuit. As a result, we conclude a dispute exists as to whether Trooper Saleh's conduct was a cause in fact of the plaintiffs' injuries.

*Immunity*

Finally, the defendants argue that regardless of whether the plaintiffs have established a prima facie case of negligence, they are immune from liability under the KTCA. The KTCA governs "claims arising from acts or omissions" by government entities. K.S.A. 75-6101(b). It provides that, subject to the Act's own limitations, "each governmental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state." K.S.A. 75-6103(a).

While the KTCA provides that governmental entities may be held liable for the negligence of their employees, K.S.A. 75-6104 sets out an extensive list of immunities, explicitly stating that liability will not lie for certain conduct. The defendants claim two of those exceptions are applicable here: the discretionary function exception under K.S.A. 75-6104(e) and the "method of providing police . . . protection" exception under K.S.A. 75-6104(n). The Court of Appeals rejected the defendants' argument, finding that not only does neither exception apply here, but also that the KTCA does not apply at all and that K.S.A. 8-1506(d) controls because it is the more specific statute.

On review, the defendants argue the Court of Appeals' conclusion regarding the discretionary function exception's applicability is incorrect. They add this court has yet to address whether the "method of providing police . . . protection" exception applies to an officer's decision to pursue a subject. We will address these exceptions in turn.

19

Under the discretionary function exception as set forth in K.S.A. 75-6104(e), government actors and entities are immune from liability for "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion is abused and regardless of the level of discretion involved." The KTCA does not define "discretionary function or duty," so we primarily look to the nature and quality of the discretion exercised to determine whether a function or duty is discretionary. *Soto v. City of Bonner Springs*, 291 Kan. 73, 79, 238 P.3d 278 (2010). This exception does not apply to any and every exercise of judgment. Instead, "'[t]he more a judgment involves the making of policy[,] the more it is of a "nature and quality" to be recognized as inappropriate for judicial review.'" *Williams,* 310 Kan. at 795.

Where, however, a clearly defined mandatory duty exists, the discretionary function exception does not apply. Such duty may arise from agency directive, caselaw, or statute. *Soto*, 291 Kan. at 80. As the Court of Appeals correctly notes, K.S.A. 8-1506(d) provides a mandatory duty for law enforcement officers such as Saleh to "drive with due regard for the safety of all persons" when pursuing fleeing suspects. As a result, the discretionary function exception does not apply to Saleh's pursuit of Horton.

The defendants argue that the Court of Appeals' conclusion that the discretionary function exception does not apply here conflicts with our precedent. Specifically, they highlight *Robertson v. City of Topeka*, 231 Kan. 358, 644 P.2d 458 (1982). In *Robertson*, this court held an officer's decision to remove the owner of a property rather than a trespasser was "an exercise of discretion within the discretionary function exception." 231 Kan. at 362. They contend the decision to pursue a fleeing suspect is just as discretionary.

Notably, though, the court in *Robertson* held the police conduct in that case was discretionary because there was no police procedure mandating how the situation should

20

have been handled. 231 Kan. at 362. The *Robertson* court went on to hold the officers did not owe a specific duty to the plaintiffs because "the duty of a law enforcement officer to preserve the peace is a duty owed to the public at large, not to a particular individual." 231 Kan. at 363-64. In contrast, K.S.A. 8-1506 imposes a specific duty on law enforcement officers to drive with due regard for the safety of all persons. Because of this mandatory duty, the discretionary function exception does not apply here.

As for the "method of providing police . . . protection" exception under K.S.A. 75-6104(n), we agree with the Court of Appeals that the exception does not apply to Saleh's pursuit of Horton. In addressing this exception, we have explained,

> "'We believe [the police protection exception] is aimed at such basic matters as the type and number of fire trucks and police cars considered necessary for the operation of the respective departments; how many personnel might be required; how many and where police patrol cars are to operate; the placement and supply of fire hydrants; and the selection of equipment options. Accordingly, a city is immunized from such claims as a burglary could have been prevented if additional police cars had been on patrol, or a house could have been saved if more or better fire equipment had been purchased. We do not believe subsection (m) [now subsection (n)] is so broad as to immunize a city on every aspect of negligent police and fire department operations. Should firemen negligently go to the wrong house and chop a hole in the roof thereof, we do not believe the city has immunity therefor on the basis the negligent act was a part of the method of fire protection.'" *Keiswetter v. State*, 304 Kan. 362, 371-72, 373 P.3d 803 (2016) (quoting *Jackson v. City of Kansas City*, 235 Kan. 278, 292, 680 P.2d 877 [1984], *overruled on other grounds by Simmons v. Porter*, 298 Kan. 299, 312 P.3d 345 [2013]).

Saleh's pursuit of Horton is not a basic matter of police protection, such as the number of personnel and cars necessary for the operation of the police department. As a result, neither Saleh nor the State are immune under this exception. As this resolves the defendants' claims of immunity under the KTCA, we decline to address the Court of Appeals' further rulings on this issue.

21

We find no error in the issues that have been presented to us for review. The judgment of the Court of Appeals is affirmed. The judgment of the district court is affirmed in part and reversed in part. The case is remanded to the district court for further proceedings consistent with this opinion.

HENRY W. GREEN JR., J., assigned.[1]
STEVE LEBEN, J., assigned.[2]

* * *

ROSEN, J., dissenting: I respectfully dissent. I would reverse the Court of Appeals and affirm the district court's grant of summary judgment. I would find summary judgment is appropriate here because the plaintiffs have failed to establish a prima facie case that Kansas Highway Patrol Trooper Patrick Saleh breached his duty of care under K.S.A. 8-1506 and that this alleged breach caused the plaintiffs' injuries.

*Breach*

Under K.S.A. 8-1506, law enforcement officers in pursuit have a duty to drive with "due regard for the safety of all persons." Mere negligence will not suffice to establish a breach of this duty. Instead, the evidence must show reckless disregard on the

---

[1] **REPORTER'S NOTE:** Judge Green, of the Kansas Court of Appeals, was appointed to hear case No. 117,518 under the authority vested in the Supreme Court by K.S.A. 2019 Supp. 20-3002(c) to fill the vacancy on the court by the retirement of Justice Lee A. Johnson.

[2] **REPORTER'S NOTE:** Judge Leben, of the Kansas Court of Appeals, was appointed to hear case No. 117,518 under the authority vested in the Supreme Court by K.S.A. 2019 Supp. 20-3002(c) to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.

part of the driver—that is, that the driver was not only aware of imminent danger to another person or the property of another but also exhibited a conscious and unjustifiable disregard for that danger. "Recklessness . . . requires running a risk substantially greater than the risk which makes the conduct merely negligent or careless." *Robbins v. City of Wichita*, 285 Kan. 455, 470, 172 P.3d 1187 (2007).

The plaintiffs do not contend Trooper Saleh recklessly initiated the pursuit, nor does the evidence suggest he did so. At the time Saleh sought to pull over the Toyota, he was aware the car had an improper license plate, which suggested the car may have been stolen. And while the plaintiffs seek to minimize this fact, Kansas Highway Patrol Sergeant Tim Tillman had observed a passenger in the car wielding a knife. Although this observation later proved likely to be in error, Saleh had reason to believe a violent crime might be taking place. When the Toyota fled, the suspicion of a dangerous situation would have been reinforced. As a result, Saleh had reason to believe the driver of the Toyota and/or its occupant were at risk independent of any traffic infraction or improper license tag.

The issue here, then, is whether Saleh acted recklessly in continuing the pursuit. Dr. Geoffrey Alpert stated in his affidavit that the pursuit became dangerous when Horton accelerated on 20th Street. He also concluded Trooper Saleh should have ended the pursuit no later than 21st Street, which would have been about 40 seconds before the accident. But Dr. Alpert did not opine that Saleh acted with a conscious and unjustifiable disregard of the danger to the public in those remaining seconds prior to ending his pursuit.

The circumstances around the pursuit do not suggest Saleh acted with reckless disregard, either. The pursuit started around 9:30 p.m. and lasted about a minute and a half. It took place mainly on a dry, artificially lit four-lane road with light traffic. During the pursuit, Saleh activated his emergency equipment. Saleh followed Robert Horton

23

through a stop sign at 20th Street while turning south on to Kansas Avenue. As the two cars were preparing to enter the intersection on 21st Street, Horton ran through a red light at a high rate of speed while Saleh slowed down as he passed through the intersection. The pursuit also passed several other cars waiting to cross or turn onto Kansas Avenue. Horton also crossed the yellow lane line and weaved around a car as he approached 29th Street.

Looking at this evidence, Saleh did not exhibit a conscious and unjustifiable disregard for imminent danger. While the pursuit posed some danger to the public, Saleh's conduct was not egregious, particularly given how light traffic was on Kansas Avenue at that time. While Saleh acknowledged that the pursuit was unlikely to be successful after Horton ran the red light at 21st Street, his failure to immediately terminate the pursuit at that particular juncture could hardly be characterized as a "consequential, material, and wanton act[]." *Robbins*, 285 Kan. at 467. This is particularly so because Saleh did not appear to have an alternative method of apprehending Horton or determining if Horton or his passenger were at risk. At that time, Horton's identity was unknown. Additionally, the Toyota had an improper license plate, so the vehicle registration likely could not be used to identify the driver.

In *Robbins*, we held summary judgment was appropriate because the plaintiffs had failed to present a prima facie case that law enforcement had breached the duty imposed by K.S.A. 8-1506:

> "In this case, there is not sufficient evidence to support a prima facie finding that the officers had a conscious and unjustifiable disregard of the danger the pursuit caused for other motorists. Here, the officers were confronted with a drunken, violent, ax-wielding, fleeing offender whose very presence put whomever he encountered at serious risk of bodily injury. Clearly, the pursuit of Drechsler was justified and the officers' were operating their vehicles in compliance with the safeguards required by K.S.A. 8-1506. To find otherwise would be implementing the use of judicial hindsight to the many split-

24

second decisions that are made by law enforcement officers under the stress of protecting the lives and safety of the public and themselves. The facts failed to establish under a reckless disregard standard that the officers in this instance breached any duty owed to the plaintiffs. Accordingly, the district court properly granted summary judgment on behalf of the defendants." 285 Kan. at 470-71.

While the circumstances facing Saleh were not as extreme as those facing the officers in *Robbins*, this does not mean Saleh's pursuit was not justified. Based on the information available at the time, Saleh had reason to believe Horton posed a danger to the public. As in *Robbins*, Saleh was faced with split-second decisions, particularly given the relative brevity of the pursuit, and I am reluctant to second-guess those decisions based on this record.

Put another way, Saleh was placed in an impossible decision-making situation. If he had not pursued a car in which he had reason to believe a violent crime could be occurring, he risked being found liable for a "negligent or wrongful . . . omission" under the Tort Claims Act. But if he did not stop the pursuit a few seconds earlier, he risked being found liable for engaging in "reckless" conduct by exhibiting "a conscious and unjustifiable disregard of the danger" under K.S.A. 8-1506. See *Robbins*, 285 Kan. at 470. In hindsight and sitting well away from a fleeing suspect, we may contemplate that Saleh made an error in judgment. But I simply cannot conclude from the proffered evidence that Saleh engaged in reckless behavior by not turning off his siren a few seconds earlier. The majority opinion gives no guidance that would be helpful to a police officer in deciding what to do because it doesn't set out how Saleh was to know when to discontinue the pursuit and how to distinguish between a decision to continue a pursuit and a reckless act consciously and unjustifiably presenting danger to the public.

As the Tenth Circuit explained in *Carl v. City of Overland Park, Kan.*, "[r]eckless acts are qualitatively different from negligent or grossly negligent acts (which are merely

25

an extreme variant of carelessness), because reckless acts require an element of deliberateness—'a conscious acceptance of a known, serious risk.'" 65 F.3d 866, 874 (10th Cir. 1995). Looking at the record, I do not find any evidence that could support a finding that Trooper Saleh's acts exhibited an element of deliberateness or the conscious acceptance of a known serious risk. At most, the plaintiffs have presented evidence of possible negligence, but mere negligence is insufficient to establish a prima facie case of a breach of the duty imposed by K.S.A. 8-1506.

*Causation*

Not only would I find that the plaintiffs have failed to establish Saleh breached his duty of care, I would also find the plaintiffs have failed to establish any alleged breach caused the plaintiffs' injuries. Before analyzing this issue, it is important to clarify the plaintiffs' precise theory of causation. The plaintiffs do not allege negligence or misconduct on Saleh's part when he commenced the pursuit. Nor do they contend that Saleh should have discontinued the pursuit immediately. Instead, the plaintiffs' case is predicated on Saleh not ceasing his pursuit during a narrow window of time—some 30 seconds, perhaps, after starting the chase and some 40 seconds before the collision. Failing to stop the pursuit during that timeframe was, according to the plaintiffs, the proximate cause of the collision.

Ordinarily, proximate cause is a question of fact for the jury. *Kudlacik v. Johnny's Shawnee, Inc.*, 309 Kan. 788, 793, 440 P.3d 576 (2019); *Hale v. Brown*, 287 Kan. 320, 324, 197 P.3d 438 (2008). But to survive summary judgment, the plaintiff must provide evidence supporting a reasonable inference that the defendant's conduct more likely than not caused the injuries sustained. A plaintiff cannot accomplish this task by relying on conjecture, speculation, or surmise. Nor will evidence of the mere possibility of causation suffice. Moreover, if "the probabilities are at best evenly balanced," courts must enter

judgment in favor of the defendant. *Yount v. Deibert*, 282 Kan. 619, 628, 147 P.3d 1065 (2006).

The narrow issue we are faced with, then, is whether the plaintiffs provided sufficient evidence, viewing that evidence in the light most favorable to the plaintiffs, to allow a reasonable factfinder to conclude that Saleh's failure to terminate the pursuit at or around 21st Street more likely than not caused Horton to collide with the plaintiffs at 29th Street. Put another way, the issue here is whether Horton behaved as he did during the pursuit because of what Saleh did or did not do. The plaintiffs' case ultimately hinges on whether they presented evidence not just that Horton may possibly have ceased his reckless driving if Saleh had ended the pursuit between 20th and 21st Streets, but that Horton more likely than not would have done so and that he more likely than not would have done so before reaching 29th Street.

In its ruling, the district court correctly identified the crux of the causation issue, focusing on Saleh's decision to continue, not initiate, the pursuit and Horton's resulting behavior. After reviewing the evidence, the court concluded the plaintiffs' theory that Horton would have stopped driving recklessly before 29th Street if Saleh had terminated the pursuit by 21st Street was purely speculative. The court held:

> "[W]ithout extrinsic evidence or some evidence emanating from either Mr. Horton or his passenger about the extent or likelihood of their attention to the pursuing vehicle of Trooper Saleh or of Mr. Horton's state of mind or probable reactions, a conclusion that he would have stopped if Trooper Saleh had stopped rests within the realm of speculative assumption . . . .

> . . . .

27

"Plaintiffs cannot, as a matter of proof—and based on the entirety of the evidence advanced—establish that Mr. Horton would see, hear, or be aware of, and if he did, would have responded positively, timely, or responsibly to the termination of the pursuit even had Trooper Saleh elected to do so at any point where the specter of a finding of reckless disregard in the act of continuing to pursue might reasonably arise."

The first component of the plaintiffs' proffered proof of causation is Dr. Alpert's affidavit, in which he stated:

"When Mr. Horton ran the stop sign on 21st, the pursuit became futile, as it is more likely than not that drivers of fleeing vehicles will continue to flee as long as they are being chased. . . . Had the police terminated their active attempt to apprehend Mr. Horton, it is more likely than not that he would not have crashed into the pick-up driven by Mr. Bennett at 29th."

"'An expert must have a factual basis for his or her opinions in order to separate them from mere speculation.'" *Kuxhausen v. Tillman Partners, L.P.*, 291 Kan. 314, 318, 241 P.3d 75 (2010).

Dr. Alpert lists several facts in his affidavit to support his conclusion that Saleh should have ended the pursuit between 20th and 21st Streets and no later than 21st Street. For example, he notes the pursuit had become dangerous and the most serious offense known to the officers was an improper license plate. From here, though, he leaps to the conclusion that if Saleh had terminated the pursuit, the collision at 29th Street more likely than not would have been avoided. Dr. Alpert does not explain how he reached this conclusion, nor does he provide any facts to support it.

The plaintiffs contend Dr. Alpert's opinion that a fleeing suspect will continue to flee as long as he or she is being pursued supports his ultimate conclusion. But even assuming this is true, this does not necessarily mean the inverse is true—that fleeing

28

suspects will stop fleeing once the police stop the pursuit. It is certainly conceivable that the suspect will stop fleeing. But, it is also likely the suspect may want to get as far away as possible from law enforcement and thus continue driving at a high rate of speed and ignoring traffic signals. Nothing in Dr. Alpert's affidavit, or elsewhere in the record, suggests either one of these possibilities is more likely than the other. And when the possibilities are equally likely, courts should enter judgment in favor of the defendant.

Even if Dr. Alpert's opinion on fleeing suspects could support an inference that fleeing suspects more likely than not will slow down once the pursuit has ended, nothing suggests the timeframe in which this would happen. Based on the plaintiffs' theory of causation, they needed to prove not just that Horton would have slowed down, but that he would have done so within about 40 seconds from when they allege Saleh should have ended the pursuit. Nothing in the affidavit would support this conclusion.

For these reasons, I agree with the district court and Judge Gardner that Dr. Alpert's opinion on causation does not rise above mere speculation. As Judge Gardner explained in her dissent:

> "Dr. Alpert's report lacks the type of factual basis normally found in expert reports. It does not, for example, state why, or in what time frame, or in what distance, or under what circumstances fleeing criminals generally slow down after they realize a police pursuit has ended. Nothing in Dr. Alpert's report shows why he thinks Horton would likely have slowed down by 29th Street if he had somehow known that the trooper discontinued his pursuit at 21st Street. Nor does Dr. Alpert attempt to apply his theory to the facts of this case—he fails to explain why a reasonable person in Horton's position, having a suspended license, driving a car with a tag not assigned to it, fleeing from a law enforcement officer, and whose passenger was a runaway minor, would likely have slowed down at any point after the pursuit began. In such cases, causation is merely speculative, as the district court found. See *Drouhard-Nordhus*, 301 Kan. at 624-25, 345 P.3d 281 (finding generalized references to be speculative and inadequate to meet

29

plaintiff's causation burden)." *Montgomery v. Saleh*, 55 Kan. App. 2d 429, 460, 419 P.3d 8 (2018).

Saleh's dashboard video camera recording of the pursuit provides no better support for the plaintiffs' theory of causation. Nothing in this recording suggests Horton was prepared to slow down within seconds of losing sight and sound of the police pursuit. In fact, in the latter half of the pursuit, Horton had already far outdistanced Saleh and at some points he was out of Saleh's sight. Saleh was too far behind Horton to witness the collision. Furthermore, Saleh was reducing his speed of travel, realizing that he could not safely keep pace with Horton, but Horton did not slowdown in response.

The plaintiffs also point to Kansas Highway Patrol Lieutenant Scott Martin's deposition. There, Lt. Martin was asked if "one of the reasons for terminating a pursuit is the hope that the vehicle being pursued will then slow down and not create a hazard to vehicular and pedestrian traffic?" to which Martin responded, "Right." But the "hope" that a pursued vehicle will slow down and drive more carefully does not rise to the level of evidence that fleeing suspects in general, and Horton in particular, will change their driving behavior within seconds of a pursuing officer turning off their emergency equipment.

If the plaintiffs were trying to prove that Saleh caused Horton to drive off at a high rate of speed by initiating the pursuit, the evidence here might allow a jury to find causation. Horton had been sitting at a traffic light, apparently conforming with traffic laws, until Saleh signaled to him to pull over. But based on the current record, it requires a significant amount of speculation to find that Horton would have stopped his reckless, high-speed driving purely because he would have become aware that Trooper Saleh had turned off his lights and siren after about a minute or so of pursuit and just seconds before Horton drove into an intersection against a red light.

30

A case from our sister state Missouri supports the conclusion that the plaintiffs have failed to make a prima facie case on proximate cause. In *Stanley v. City of Independence*, 995 S.W.2d 485 (Mo. 1999), a police officer attempted to stop a van used in an armed robbery. The van fled, leading to a 45-second pursuit reaching 70 miles per hour. During the pursuit, the fleeing van moved into the oncoming lane of traffic and collided with another car, killing the occupants.

In a wrongful death suit brought on behalf of the decedents, the district court entered summary judgment in favor of the City. On appeal, the Missouri Supreme Court affirmed. Applying the same standard for proximate cause as Kansas, the court found the officer's conduct was not the proximate cause of the collision, explaining:

> "The suspects in the van made the initial decision to flee, sped through red lights and in the wrong lane of traffic, and collided with the decedents. Any negligence by [the officer] is connected to the plaintiffs' injury solely through the conduct of the fleeing van. Thus, the only conceivable causal link between the officer's alleged negligence and the collision is the conjectural effect of his pursuit on the pursued vehicle. Shortly after initiating the pursuit, the officer observed, 'this guy is going nuts on us.' There is nothing other than speculation to reach a conclusion that the officer's conduct was a 'cause' of the collision. Put another way, *there is no way to tell whether the collision would have been avoided if the officer had abandoned the pursuit after initiating it.* Thus, there is no factual basis to support a finding of proximate cause." (Emphasis added.) 995 S.W.2d at 488.

Here, the plaintiffs proffered evidence of what Trooper Saleh did, and they presented evidence of what Trooper Saleh perhaps should have done. But what they also needed was evidence of how Horton's behavior was affected by Trooper Saleh's failure to do what they argue he should have done. While it is certainly not unreasonable to assume a fleeing suspect may slow down if police end a pursuit, a prima facie case of negligence must be built on evidence and reasonable inferences, not assumptions.

31

Based on this lack of evidence as to causation, as well as the lack of evidence establishing a breach of duty, I would reverse the Court of Appeals and affirm the district court's grant of summary judgment to the defendants.

STEGALL, J., and GREEN, J., join in the foregoing dissent.